## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## (NORTHERN DIVISON)

| | |
|---|---|
| CARLY GOLDSTEIN<br>434 Hanover Street<br>Baltimore, MD 21201 )<br><br>Plaintiff, )<br><br>v. )<br><br>UNIVERSITY OF MARYLAND<br>SCHOOL OF MEDICINE )<br>655 W. Baltimore St. )<br>Suite 14-015 )<br>Baltimore, MD 21201 )<br><br>& )<br><br>UNIVERSITY OF MARYLAND,<br>BALTIMORE )<br>620 W. Lexington St. )<br>Baltimore, MD 21201 )<br><br>& )<br><br>BALTIMORE RESEARCH AND<br>EDUCATION FOUNDATION, INC. )<br>Baltimore VA Medical Center )<br>Room 3A-125 )<br>10 North Greene Street )<br>Baltimore, MD 21201, )<br><br>Defendants. ) | Civil Action No.<br><br>Jury Trial Requested |

## COMPLAINT

[Title VI, Title VII; Title IX, MFEPA]

## I.      NATURE OF ACTION

Plaintiff Carly Goldstein brings this case alleging sexual harassment, retaliation and constructive discharge, under various statutes.

## II.      JURISDICTION AND VENUE

1.      This Court has subject-matter jurisdiction over this Complaint pursuant to 42 U.S.C. § 2000d-7 and 28 U.S.C. § 1331 because this action arises under the laws of the United States.

2.      This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a), because they arise from a set of operative facts also common to the federal claims.

3.      Venue is proper in the United States District Court for the District of Maryland pursuant to 28 U.S.C. § 1391(b) because all of Defendants' actions and omission giving rise to the claims in this Complaint occurred in the State of Maryland.

## III.      PARTIES

4.      Plaintiff Carly Goldstein ("Goldstein") resides in the State of Maryland.

5.      The Baltimore Research and Education Foundation, Inc. ("BREF") is a 501(c)(3) tax exempt entity designed to coordinate medical research within the VA Medical Health Care System.

6.      The University of Maryland School of Medicine is a medical school within the University of Maryland, Baltimore.

7.     The University is a Maryland, Baltimore, is a state government entity, that operates educational programs that are subject to Title IX.

8.     Together, the Medical School and UMB will be referred to herein as "University"

9.     During all times at issue in this complaint, BREF was an employer of Goldstein

10.    During all times at issue in this complaint, the University of Maryland, Baltimore and its medical school, were joint employers of Goldstein pursuant to applicable case law, as described below.

## IV.    EXHAUSTION OF ADMINSTRATIVE REMEDIES

11.    On February 3, 2017, Goldstein filed a charge of discrimination with the Equal Employment Opportunity Commission, that was cross-filed with the Baltimore City Community Relations Commission, against the University of Maryland School of Medicine. It was assigned the Charge number: 531-2017-00838.

12.    On March 24, 2017, Goldstein filed a charge of discrimination with the Equal Employment Opportunity Commission, that was cross-filed with the Baltimore City Community Relations Commission, against BREF, which was assigned the charge no. 531-2017-01182.

13.    University of Maryland Medical Systems received the charge and forwarded it to University of Maryland School of Medicine.

14.    A response was submitted by University of Maryland, Baltimore

15.     On July 27, 2018, EEOC issues Right to Sue Notices in Charges Nos. 531-2017-00838 and 531-2017-01182.

16.      No additional administrative remedies were required under the Maryland FEPA or Title VII.

**17.**     No particular administrative remedies need to be exhausted prior to filing suit under Titles VI or  IX.

## STATEMENT OF FACTS

### A. Background

18.     Plaintiff Goldstein began her affiliation with the University of Maryland Medical Center in 2012 when she began as a research intern.

19.     Goldstein entered into a position located at the Baltimore VA Medical Center during 2013.

20.     At the relevant times for this suit, The Baltimore Research and Education Foundation, Inc (BREF) issued Goldstein's paychecks and considered her its employee.

21.     Goldstein was a "research coordinator."

22.     Starting in or around March 2014, Goldstein's job assignments and work were directly managed and supervised on a daily basis by Dr. Robert S. Crawford and Dr. Brajesh Lal, employees of the University, who were stationed at the VA Center for research purposes.

23.     Crawford claims that his major leadership roles at the University of Maryland included serving as co-director of the Center for Aortic Disease which he led from its inception.

24.     Crawford also asserts that he served as the Medical Director of the Vascular Surgery Progressive Care Unit, and Associate Program Director of the vascular surgery fellowship.

25.     Crawford says he led the development of the vascular acute care surgery (VAX) practice at UMMC, the first academic practice of its kind in the country.

26.      Starting in 2014, the University's Crawford controlled Goldstein's job assignments, and where and how she performed them.

27.     For instance, Goldstein was required to meet with Crawford numerous times per day to discuss his research studies.

28.     Crawford, in conjunction with Lal, controlled Goldstein's work schedule and various other material terms of her employment.

29.     Dr. Rajabrata Sarkar is Chief of Vascular Surgery for the University of Maryland Medical Center.

30.     Dr. Shahab Toursavadkohi is an Assistant Professor for the University

31.     Sarkar supervised Lal, Crawford, and Toursavadkohi.

## B.  Sarkar Permits a Sexually Abusive Work Atmosphere at the VA

32.     Sarkar gave his blessing to the highly sexualized work atmosphere described below, including by making his own improper remarks.

33.     For instance, n 2013, on an occurrence in which Goldstein went to Sarkar's clinic to recruit patients for the EUCLID study, Sarkar asked in her presence: "How does a sorority girl eat a banana?"  He then mimicked fellatio. He laughed to himself then walked away.

34.     On one occasion, Sarkar was conducting a training presentation at the hospital.  It is referred to as "Grand Rounds."

35.     Upon starting the projector part of the presentation, porn from his laptop flashed on the screen.

36.     Other male managers would often comment on the perceived sexual attractiveness and sexuality of particular female employees.

37.     For instance, one male employee asked a woman who was bent over to pick something up, "you bend over all the time like that?"

38.     Sarkar was present on numerous occasions for similar ("you bend over all the time like that" ) comments by Crawford.

39.     For most of the relevant time period, Goldstein's pay from BREF was funded by proceeds from Crawford's study.

### C.  Crawford is Generally Abusive and Threatening

40.     Supervisor Crawford had a bad temper.

41.     When angry, Crawford's  face would become noticeably red.

42.     Witnesses have observed Crawford throwing objects at nurses in the Operating Room.

43.     Crawford has even thrown knives at nurses.

44.     A witness has observed Sarkar saying: "I love that Rob in a monster."

45.     Sarkar is known to have said that he "wound"  Crawford up.

46.     Sarkar has said that he "turned [Crawford]  loose to do his dirty work."

### D. Crawford Commences Sexually Harassing Goldstein, Around April 2014, Including Taking her to a bar Under False Pretenses

47.     In summer 2014, Lead Clinic Research Specialist Melita Braganza told Goldstein that she had observed Crawford behaving in a sexually inappropriate way toward another research coordinator.

48.     However, although Crawford's aberrant behavior was previously known to Defendants, they did nothing to protect Goldstein prior to her supervisor's targeting her.

49.     Thus, starting during or around April 2014, Crawford would periodically state that he was unable to concentrate because he was looking at Goldstein's body.

50.     Crawford's harassment of Goldstein was visible to others. For instance, at group meetings, Crawford would be sure to sit next to Goldstein, and would even move to be sure he was sitting next to Goldstein.

51.     Goldstein reacted to Crawford attempts to draw close in ways that made it obvious that she was uncomfortable.

52.     For instance, Goldstein would grimace and squirm away, so as to avoid Crawford's touch, thereby demonstrating to him that his advance was unwelcome.

53.     In later summer (August – September 2014), Crawford drove his subordinate, Goldstein, to a local bar under the pretense that he was taking her to a cadaver lab for work-related purposes.

54.     At the bar, Crawford became increasingly aggressive and moved close to Goldstein, placing his arm around her.

55.     Crawford became angry when Dr. Monahan and Greg Kowalewski arrived at the bar so that Goldstein would not have to be alone with Crawford.

56.     Crawford stated he wanted to go to another bar and that Goldstein should leave with him so that they could be alone.

57.     Goldstein declined, thereby demonstrating to him that his conduct was unwelcome, and Crawford left angrily.

### E. Crawford Demands That Goldstein Grant him a Date as a Condition of his Providing Requisite Assistance to her in Completing her Work Tasks

58.     Subsequent to the cadaver lab incident, Supervisor Crawford frequently requested that Goldstein meet him "over a beer."

59.     To obtain Goldstein's acquiescence in his quid pro quo exchange, he would respond to Goldstein's requests for completion of work tasks, such as for his signature on documents, or his recommendation on how to handle a particular matter, with a demand that Goldstein agree to go to a bar with him.

### F. Crawford Implements a Campaign of Threats and Intimidation Despite Goldstein's Insistence That she did not Wish to be More Than "Friends"

60.     Although Goldstein sought to avoid meeting one-on-one with Crawford, in seeking a one-on-one off-campus get together, he would point out that when he took Goldstein to the bar he didn't "do anything" to her.

61.     This pressure was unrelenting.

62.     Crawford would frequently make comments at work, about being miserable at home.

63.     Together with expressing this "misery", Supervisor Crawford would sometimes directly ask his subordinate for a date.

64.     Goldstein would repeatedly tell him that she was open only to being friends as fellow professionals.

65.     The harassment described above and below represents treatment that continued throughout Goldstein's tenure, with gaps of no more than a few weeks at a time.

66.     For instance, Crawford would repeatedly tell Goldstein that he missed her.

67.     Crawford would repeatedly express displeasure at Goldstein for ignoring him.

## G. Crawford Comments Inappropriately to Goldstein on her "Boobs"

68.     On numerous occasions, Supervisor Crawford commented on Goldstein's body.

69.     For instance, he made assertions along the lines of: "that necklace brings out my favorite feature of yours… your boobs."

70.     As a way of demonstrating her disinterest in a sexual or  romantic relationship, Goldstein would begin communicating with Crawford in a formal way, such as by calling him "Dr. Crawford."

71.     Crawford  would respond: "I want you to call me Robert. I am the only person you call by last name."

## H. Crawford Stalks his Subordinate, Goldstein, in November 2014

72.     On November 4, 2014, Crawford interrupted Ms. Goldstein's

dinner with her sister, Cathy Hamski-Goldstein, at Camden Pub.

73.     After he arrived at Camden Pub, Crawford began drinking

excessively.  He then became inappropriate and made everyone feel

uncomfortable.

74.     At no point during that evening did Ms. Goldstein flirt with her

supervisor, Crawford, nor did she ever kiss him or ask him to kiss her.

75.     At the end of the evening, Crawford insisted on driving Ms.

Goldstein and Ms. Hamski-Goldstein to their homes, but they refused, not only

because he was aggressive and obnoxious, but because he was clearly

intoxicated.

76.     That evening, Dr. Crawford repeatedly called and texted (including

numerous times between midnight and 3:00 AM) and he was upset at her the

following day because she left the Camden Pub without him.

77.     Goldstein responded that he was intoxicated and that they simply

decided to go home on their own.

**I.     Crawford Harasses a Product Sales Representative in
         November or December 2014, While Stalking Goldstein as
         Well, but Defendants Fail to Intercede and Instead
         Promote Crawford**

78.     Meanwhile, in November or December 2014, management received

a complaint that Crawford was demanding that a female product sales

representative spend time alone with him in order for him to consider the products he was selling.

79.     Sarkar became familiar with the situation, as did Stephen Bartlett, Chairman of Surgery.

80.     Sarkar admitted to Melanie Hoehn that he believed the saleswoman's allegations.

81.     Sarkar told Hoehn that he would not be relieving Crawford of his duties because of this misconduct.

82.     Hoehn appealed the matter to Dr. Stephen Bartlett, who admitted that a letter would remain in Crawford's "file".

83.     Crawford was promoted less than one year thereafter, with the full support of the division chief as well as the chairman

84.     At less than one year after Hoehn's complaint, the University also knew all about Crawford's harassment and retaliation against Goldstein.

85.     No  adverse action was taken as a result of the harassment of the saleswoman as reported by Hoehn, to prevent Crawford from continuing to harass women.

86.     Crawford used his position to retaliate against Hoehn by drastically reducing his inclusion of her on the schedule.

87.     Accordingly, Hoehn met with Bartlett.

88.     With Sarkar's assistance, Crawford virtually excluded Hoehn from the vascular surgery team.

89.     Still late in 2014, Hoehn met with Dr. Bartlett to vocalize her complaints.

90.     Bartlett admitted that Hoehn was dealing with a "boys club", but completely dismissed her concerns.

91.     The environment in the division remained hostile to Hoehn. was informed by Dr. Sarkar that I "should just be happy I get to eat at the table with the rest of the men."

92.     Hoehn has watched medical students cringe in response to sexually explicit jokes in the OR.

93.     Hoehn maintains that by refusing to appropriately report sexual harassment, lying to the people making complaints, allowing severe career altering retaliation to those who protest, and promoting the offenders, Drs. Sarkar and Bartlett have sent a clear message to the women in the department that harassment, discrimination, and retaliation are acceptable, and that reporting these incidents is futile.

**J.   Crawford Continues to Oppress Goldstein, Threatening a Surgery Fellow who Tried to Help Goldstein**

94.     Thus, during or around February 2015—after the meeting with the Title IX Office, Goldstein was invited to go to a "meet and greet" event for the vascular surgery training program.

95.     At that event, Crawford once again insisted that Goldstein sit closer to him and made sexual comments to her.

96.     Vascular Surgery Fellow Dr. Behzad Farivar, tried to intervene on Goldstein's behalf.

97.     However, Crawford responded by threatening Farivar, asserting that he was Dr. Farivar's supervisor and "did not need to graduate" him.

98.     Goldstein became so uncomfortable that she called for a ride and left the restaurant, thereby demonstrating to him yet again that his conduct was unwelcome.

99.     Undeterred, however, Crawford yet again followed her outside the restaurant, insisting that he would drive her home.

### K.  Goldstein Objects to Toursavadkohi in Summer, 2015, That Crawford Won't Leave her Alone;  Toursavadkohi Fails to Inform her That Crawford Harassed Others

100.     In summer 2015, Toursavadkohi commented to Goldstein that every time Crawford mentioned her name to him, Crawford would put his hand on hi heart and pretend to get weak and state, "I'm in love with her."

101.     Once during this time period, Toursavadkohi asked Goldstein, "[w]hat did you do to this man?"

102.     Goldstein responded by saying: "nothing, he's ridiculous and won't leave me alone."

103.     Toursavadkohi did not inform Goldstein that other subordinates of Crawford's had been sexually harassed in the past.

104.    Toursavadkohi did not  initiate any investigation into Crawford's treatment of Goldstein in summer 2015.

**L.   Crawford Ramps up his Unwanted Harassment of Goldstein Between June and October 2015, Including Comments About "having her for twenty-four hours" That she Looked "Sexy" That he was "crazy about her," that she was "smoking hot," Even Though she "[wouldn't] let [him] kiss her," and that "he liked her smell[,]" Attacks Goldstein at Goldstein's Brother's House, Threatens Goldstein of Withholding a Graduate School Recommendation, and Retaliates Against her Through the job, for not Relenting**

105.    Crawford continued to harass Goldstein during summer 2015.

106.    **For instance, on July 15, 2015**, Crawford told Goldstein, "I'd kiss you, but you won't let me," further supporting that Dr. Crawford had attempted physical contact with Goldstein that she repeatedly rejected.

107.    On July 19, 2015, Goldstein declined an invitation for drinks by texting "I'm busy."

108.    Crawford responded, "again with that shit!"

109.    These texts were not referenced when the Title IX office issued its report.

110.    In person he would often raise his voice and express his anger that Goldstein was refusing to go on dates with him.

111.    Crawford threatened Goldstein's work viability, stating that if she was not willing to get drinks with him and hang out with him, he would work on other projects, rather than the ones they were working on together.

112.    Crawford made good on this threat.

113.    Thus,  Goldstein informed Sarkar that Crawford was not doing the work assigned to him, which was affecting Goldstein's ability to do hers.

114.    Crawford further threatened that if Goldstein wanted to succeed in the study, she would have to prove it to him by being willing to get drinks with him.

115.    Crawford also made numerous assertions to Goldstein that the opinion of Dr. Michael Terrin, who was national chair of the study on which Goldstein was working, carried significant weight with respect to obtaining an entrance into the graduate school of the School of Public Health.

116.    Crawford would also on multiple times tell Goldstein that Terrin could get her into graduate school "with one phone call" –and that Crawford had a unique ability to influence Terrin.

117.     On July 24, 2015, Crawford insisted on following Goldstein to her to her brother's house, where she was staying.

118.    Goldstein again rejected Crawford's advances, by refusing to invite him in.

119.    Crawford responded that this reflected Goldstein being "rude".

120.    When Goldstein finally relented and told Crawford that he could come in for a minute, Crawford immediately tried to kiss Goldstein and reach his hand down her shirt.

121.    Goldstein had to push Crawford away to defend herself against this attack.

122.    Goldstein also told Crawford to get out of the house.

123.     On July 28, 2015, Goldstein continued to text with Crawford after this incident, as he was her supervisor and she felt she needed to maintain a professional relationship, despite her unhappiness with his mistreatment of her.

124.    On July 30, 2015, Crawford told Goldstein: "you are smoking hot in the way that I enjoy."

125.    Crawford sent text messages to Goldstein a few days later, after midnight on August 6, 2015, when he told her that he was still thinking about her, that he liked her smell and that he thought that she was afraid to have feelings for him.

126.    Goldstein never responded to any of these text messages.

127.    On August 9, 2015, Crawford texted Goldstein yet again, and Ms. Goldstein responded in a friendly manner.

128.    However, when Crawford stated that he missed Goldstein, she ignored his inappropriate comment and tried to steer the discussion back to work-related issues.

129.    Thus, on September 20, 2015. Crawford told Goldstein that: "[y]ou looked so sexy on fri I can't get you out of my head,"

130.    A few weeks later, on October 15, 2015, Crawford told Goldstein that, "I would give a pinky to have you for 24 hours[.]"

### M.    Goldstein is Sexually Harassed by Dr. Lijo Panghat in Around October 2015

131.    In October 2015, Dr. Lijo Panghat, a colleague on research projects, repeatedly sent Goldstein text messages seeking dinner dates and asking to come to her home and otherwise harassed her.

### N.   Crawford Continues his Harassment in November 2015, Including Non-Consensual Sexual Contact

132.    In November 2015, Crawford and Goldstein met at The Brewer's Art, a restaurant in Baltimore.

133.    On this occasion, without permission of any kind, Crawford reached his arm around Goldstein, touched her legs and thigh and commenced kissing her against her will.

134.    Crawford asked: "can I touch you here?" but didn't wait for the response before touching her.

135.    Goldstein repeatedly said "stop" – yet again demonstrating that Crawford's advances were unwelcome- but to no avail.

136.    Goldstein began to cry and begged Crawford to stop.

137.    Crawford became angry and said she "needed to relax and grow up."

138.    Crawford further attacked that she was "acting like a child."

139.    Crawford further attempted to bully Goldstein by stating that Goldstein "did not turn down [her prior boyfriend]."

140.    That same month, Crawford asked Goldstein to go to New York with him for a conference.

### O. Goldstein Further Protests of Crawford's Sexual Harassment in November 2015, and Toursavadkohi is Apprised

141.    That same night, Goldstein informed Vascular Surgeon Dr. Nate Dayes, who had trained under Crawford as a fellow, concerning what happened.

142.    Goldstein told Dayes she was afraid to return to work.

143.    It is undisputed that Dayes reported this matter to Toursavadkohi sometime between November 17 and November 24, 2015.

### P. Crawford Attempts to Fire Goldstein Just After his November 2015 Attack at The Brewer's Art

144.    Still in November 2015, after the Dayes report, Toursavadkohi called Goldstein to his office for a discussion.

145.    Toursavadkohi told Goldstein that Dayes had told him what happened at The Brewer's Art.

146.    Toursavadkohi also  informed Goldstein that Supervisor Crawford had requested that Goldstein be removed from the division.

147.    Toursavadkohi admitted that Goldstein was working well on the projects.

148.    Toursavadkohi admitted that he recognized the temporal connection between The Brewer's Art incident and Crawford's request to fire Goldstein.

149.    Goldstein informed Toursavadkohi further about the attack at The Brewer's Art, noting that Crawford repeatedly touched her without permission until she cried, and she ran out of the bar in tears.

150.    Goldstein also informed Toursavadkohi that Crawford's behavior was so aggressive that the bartender had to intervene to ensure she was okay.

151.    Goldstein also made it clear that Crawford was repeatedly harassing her in the office as well.

152.    Toursavadkohi admitted to Goldstein right then that he believed Supervisor Crawford's actions must have been in retaliation for Goldstein's rejecting his advances.

153.    Still in the meeting, upon hearing Toursavadkohi agree that Goldstein was being retaliated against in Crawford's request to remove her from the division, she started crying, and said: "all because I wouldn't sleep with him. What is wrong with everyone here?"

154.    Still in the meeting, Toursavadkohi stated that  he would "handle it" and kept saying "don't worry, I will take care of Crawford, he will not do this again."

155.    Toursavadkohi additionally repeated spoke about Crawford having two girls and he should not treat women this way because that would be "bad karma."

156.    Still in this meeting, Toursavadkohi admitted to his view that sexual harassment and assault were to be expected, saying: "[y]ou are a pretty girl and of course guys will ask you out."

157.    Toursavadkohi failed to investigate, report the matter to Human Resources, or do anything to assure Goldstein's safety.

### Q.  Instead of Apologizing for his November 2015 Attack Upon Goldstein at The Brewer's Art, Crawford Demands Another Private Meeting, Whereupon he Demands That Goldstein Rescind her Sexual Harassment Complaints

158.    Crawford was ordered to apologize to Goldstein.

159.    However, Crawford insisted that Goldstein again meet him at a restaurant.

160.    He then scolded Goldstein she had overreacted.

161.    Crawford admonished Goldstein that she should not have told Dayes nor Toursavadkohi what he had done to her at The Brewer's Art.

162.    Crawford then whined that Goldstein's complaints had damaged his surgical relationship with Toursavadkohi.

163.    Crawford then demanded that Goldstein rescind her sexual harassment complaints against him, and instead admit that she overreacted to Crawford's advances.

### R. Goldstein Protests Panghat's Sexual Harassment to Braganza, in December 2015

164.    Goldstein protested to Braganza that Panghat's behavior was bordering on stalking.

165.    Instead of vowing to correct the behavior, Braganza responded that in Panghat's culture, walking a woman home was customary.

166.    Braganza proceeded to implicitly blame Goldstein, instructing her that she needed to reject Panghat "more firmly."

167.    Goldstein then reported the Panghat harassment to Lal in December 2015.

168.    Lal responded that she should correspond with Dr. Panghat only via email.

169.    This was of little consequence since they worked in the same room a few cubicles away.

170.    Goldstein also notified Toursavadkohi about the Panghat harassment.

171.    Toursavadkohi responded, "I will put him up against a wall and tell him: you leave her alone right now."

172.    On or around December 11, 2015, Goldstein went to management at BREF and the Veterans Administration and reported the ongoing harassment she was suffering.

173.    However, the harassment continued.

**S.  Defendants Admit Anger at Goldstein for Protesting Panghat and Retaliate Against Goldstein, Despite Also Removing Panghat**

174.    Lal effectively reprimanded Goldstein for her Panghat complaint by telling her that he was "very unhappy" she complained to the VA rather than to him.

175.    Panghat was removed from his post-doctoral fellowship by the University shortly thereafter.

**T.  Crawford Admits to Goldstein That he Retaliates Against Women who Protest his Discrimination, and Retaliates Against Melanie Hoehn for Protected Protest;  Bartlett Admits That Defendants are Running a "Boys Club"**

176.     Crawford suffered no discipline for his treatment of Goldstein in 2014, 2015 or 2016.

177.    Melanie Hoehn protested to Bartlett about the discriminatory discrepancy between Crawford's treatment of male subordinates as distinct from females.

178.    Bartlett responded with an admission, by rolling his eyes and saying: "poor Melanie, you are dealing with boys club."

179.    Crawford retaliated against Hoehn for her complaints by revoking assignments from her.

180.    Crawford then would look for excuses to allege that Hoehn's work was poor.

181.    Crawford admitted his retaliatory treatment of Hoehn to Goldstein, boasting that he wanted to destroy Hoehn's career for her prior complaint she had made against him.

182.    Crawford stated to Goldstein in early 2016 that he was punishing Hoehn by "starving her for cases[.]"

183.    Thus, Hoehn suffered retaliation at Crawford's hands that the University Defendants failed to prevent or correct.

184.    He further admitted to Goldstein that Sarkar knew of his plan and was supportive.

185.    This certainly increased Goldstein's fears of retaliation if she were to complain about his treatment of her.

186.    Furthermore, in reference to Panghat's ouster, Crawford, without invitation, put his arm around Goldstein's shoulder, and then conceded, in a serious tone: "I've done much worse to you than he did but we both know you couldn't report me. Look what happened to you for reporting him."

187.    Goldstein perceived this as a threat'

188.    In the meantime, Crawford was failing to provide Goldstein information that was responsive to study sponsors.

189.    This was extremely stressful for Goldstein because she felt

obligated to offer explanations for her inability to respond fully.

190.    Goldstein was very concerned that her future professional licensure

could be affected by allegations concerning the study.

191.    For instance, Crawford would fail to order CT scans and blood

work, and Goldstein was not authorized legally to order these services.

192.    But to emphasize his power over Goldstein, Crawford would

"remind" Goldstein that his study, N-TA3CT supported her full salary.

### U.  Goldstein Informs Sarkar of the Sexual Harassment, Seeks Corrective Action With the Title IX Office in January 2016

193.    On January 19, 2016, Goldstein was at an Au Bon Pain restaurant

crying over the harassment when she ran into Sarkar and told him about it

194.    On January 28, 2016, Goldstein met with the Deputy Title IX

Coordinator.

195.    This was a meeting pertaining to Panghat's harassment of

Goldstein.

196.    This meeting failed to halt  harassment of Goldstein.

197.    The Title IX Office conducted an investigation, but never of

Goldstein's retaliation complaints; nor did Title IX ever follow up to assure non-

retaliation.

198.    Rather than ameliorate it, this investigation ratified the harassment

of Goldstein.

**V.  Sarkar is Again Informed That Crawford is "Abusing"
Goldstein, and Admits his Awareness; Nonetheless,
Crawford's Harassment Continues in March 2016**

199.    During March 2016, Sarkar met with Goldstein to discuss the

clinical research trials.

200.    Goldstein told Sarkar at the meeting that Crawford was

increasingly difficult to work with and often refuses to complete his research

duties.

201.    Sarkar stated that Goldstein should copy him on any study-related

e-mail from study sponsor if Crawford does not complete his duties.

202.    Sarkar never addressed her complaints or stated that he would

correct Crawford's behavior in any other way than copying him on an e-mail.

203.    So even after the Sarkar meeting with Goldstein, Crawford

continued to respond to Goldstein's requests that he would do "everything [she]

wanted" if she would agree to get a beer with him.

204.    Goldstein notified Sarkar that Crawford was refusing to work on

his study and was being abusive towards Goldstein.

205.    Goldstein copied Sarkar on an email on March 17, 2016.

206.    Crawford reprimanded Goldstein for copying Sarkar – even though

she was simply following Sarkar's instructions by doing so.

207.     At some point in March 2016, Sarkar admitted his knowledge to another person-- that Crawford, "did something terrible to that girl in research and it's damaged his relationship with Tour. Tour is mad at him."

208.     Upon information and belief, "that girl in research" was Sarkar's reference to Goldstein.

### W. Crawford Retaliates Against Goldstein for Protesting Crawford's Harassment to Sarkar, in March 2016; Crawford Declares he is "Going Back to Stalking" Goldstein

209.     By this time, Defendants should long since have put a stop to Crawford's stalking, threatening and retaliating against Goldstein, but had not.

210.     Instead, shortly after Goldstein's March 2016 interactions with Sarkar, Crawford called Goldstein and screamed at her for copying Sarkar on an email as Sarkar had instructed her.

211.     On March 28, 2016, Crawford lashed out at Goldstein again, threatening that he was "done with [Goldstein] ignoring him."

212.     Crawford then stated that he was "going back to stalking [her]."

213.     Neither the stalking admission, the admission that he knew Goldstein was avoiding him, nor the text admitting that Goldstein "hated" him, was ever mentioned in the Title IX report.

**X.  Goldstein Protests to Toursaveadkohi yet Again, but his**
**Failing Response is to Laugh, Tell Goldstein That she is**
**"too Nice to him" and Needs to say "no" Harder**

214.     Goldstein further protested to Toursaveadkohi about Crawford's behavior during meetings, and his repeatedly asking Goldstein out on dates.

215.     Toursavadkohi responded by telling Goldstein that she was being too nice to him and needed to say no harder.

216.     He said that Goldstein was a pretty girl, so he  expected Crawford to chase her because he couldn't help it around pretty girls.

217.     To emphasize Goldstein's frustrations, she told Toursavadkohi that Crawford was being so difficult that "he acted like I had to blow him to get him to sign a piece of paper."

218.     Toursavadkohi did not respond to the seriousness of the circumstances, rather treating the issue as funny.

219.     Toursavadkohi only laughed and said, " yeah he's that difficult to all of us, just worse on you because he likes you."

220.     None of these interactions were mentioned in the subsequent university internal Title IX report, which incredibly concluded that Crawford's behavior was not "unwelcome" to Goldstein.

221.     In the context of her superiors' failures to curb the situation, Goldstein became fearful of Crawford's retaliatory nature and texted him shortly thereafter, apologizing for cc'ing Sarkar.

222.     Crawford again reprimanded Goldstein for her complaints-- as happened when she previously reported the sexual assault to Toursavadkohi.

### Y. Crawford Threatens to "Kidnap" Goldstein in a Text While Lusting After his Subordinate's "Ass", in March and April 2016

223.     Around this same time, Crawford insisted on pointing out how much weight he lost.

224.     In March 2016, at a group meal, someone told Crawford he looked like he'd lost weight. He said it was "because of Carly."

225.     On April 1, 2016, he texts, "I want you so bad! I can't deny it; I may need a doctor." And "I saw ur picture; I almost had a heart attack."

226.     He further writes, "Im going to kidnap u; adopt u; marry u… clone u; eat u; can't even see ur ass but it looks phenomenal."

227.     None of these texts were referenced in the Title IX report.

228.     That same month, Crawford attempted to induce Goldstein to take a trip to Costa Rica with him, but she refused.

### Z. Crawford Requires Goldstein to Recommend him for Promotion in June 2016, but Goldstein Protests his Harassment Again, Instead

229.     On or about June 7, 2016, Crawford told Goldstein that she would be contacted by Sarkar for her opinion about his becoming promoted, and ordered her that she "must" recommend him when called by Sarkar.

230.    Goldstein responds to his demand affirmatively – because she felt obligated to do so.

231.    However, when Sarkar called Goldstein she unequivocally disagreed with the promotion.

232.    Goldstein once again protested to Sarkar that Crawford abused his authority over her.

233.    This is hardly the response of a recipient of "welcome" sexual advances.

AA.    **Instead of Interrupting Crawford's Harassment of Goldstein, Sarkar Informs Crawford That she Opposed his Promotion, and Crawford Ramps up his Harassment and Hostility**

234.    Sarkar informed Crawford that Goldstein opposed his promotion.

235.    Crawford told Goldstein that he knew about Goldstein's assertions to Sarkar.

236.    Crawford then increased his hostility against Goldstein significantly, in the June-July 2016 period.

237.    Goldstein feared being fired.

238.    Crawford would repeatedly tell Goldstein that his family was away.

239.    He said on several occasions that he "just wanted a friend" and "to have a good time."

240.   He also said that he was upset that he couldn't find anyone who would have an affair with him.

241.   At least once during the June-July 2016 period he said, "I want to have a fun affair and go on nice vacations."

242.   Goldstein responded that she was not going to have an affair with him, thereby indicating again that his advances were unwelcome.

**BB.   Goldstein Protests Supervisor Crawford to Toursavadkohi, and Again, Toursavadkohi Laughs That he Needs to Find a Woman who Will Have an "Affair" With Crawford**

243.   When Goldstein protested this "affair" request to Toursavadkohi, Toursavadkohi laughed and said, "we should find a woman who would have an affair with him so he'd leave [Goldstein] alone."

244.   Tragically, Toursavadkohi found Crawford's behavior to be a source of humor rather than a discipline issue, and that was never reflected in the Title IX "Summary of Investigation."

245.   Around this time, Goldstein notified Toursavadkohi that Crawford kept indicating that he wanted to get her drunk.

246.   Goldstein made this complaint to Toursavadkohi  on multiple occasions.

247.   At each occasion, Toursavadkohi would respond that Goldstein should notify him "when [Crawford] crosses a line."

248.    On at least one occasion in this time period, he said, "[i]f he does anything bad like last time, let me know and I will take care of it."

249.    He further offered to "yell at Crawford" and "tell him to stop."

**CC.    Crawford Admits Understanding That Goldstein was not Interested in Him**

250.    Goldstein told Crawford around this time that she did not want a romantic relationship with Crawford.

251.    Crawford then told Goldstein that he would not be inappropriate toward her, but just wanted to maintain a professional friendship and help her achieve her career and academic goals.

252.    Crawford also complained that he was very unhappy with his home life and was happy to be around her.

253.    Crawford also said he understood that Goldstein did not wish to engage in any sexual relationship, but begged Goldstein her to remain friends with him, despite his past behavior and threats toward her.

254.    As a result of these assurances, Goldstein agreed to have dinner with Crawford.

**DD.    Crawford Repeatedly Subjects Goldstein to Unwelcome Touching at Restaurant Pazo, on July 18, 2016, and Fabricates Bogus Alibi Including That Goldstein Accompanied him to a Strip Club; Crawford Tells Goldstein he "Loves" her**

255.    On June 13, 2016, Supervisor Crawford told Goldstein that she should "Get a sugar daddy."

256.    On July 19, 2016, Crawford asked Goldstein to the restaurant Pazo, supposedly to celebrate the success of the study that they were working on together, thus a professional get-together.

257.    However, Crawford began drinking excessively, pushed Goldstein to do so as well, and repeatedly tried to kiss his subordinate Goldstein, and touch her inappropriately.

258.    Goldstein repeatedly warned Crawford to stop touching her, and when he repeatedly refused, she again escaped-- grabbing her bags and running out of the bar in order to go home.

259.    In a desperate attempt to fabricate an aura of consent in the circumstance of his assault upon her at Pazo, Crawford falsely told the Title IX investigators that Goldstein accompanied him later that evening to Scores, a strip club.

260.    However, though the Investigators meritlessly asserted that Goldstein parted ways with Crawford at 11:30 (while Pazo was still open, in any case), rather than earlier, and Goldstein's later text stating that she "ran out" of Pazo "without saying goodbye," the Investigators failed to make the correct credibility determination that Crawford's "strip club" story was a big lie.

261.    At no point, on that night or any other night, did Goldstein ever go to a strip club with her supervisor, Crawford.

262.    On July 20, 2016, Crawford called her and apologized for his behavior and getting intoxicated.

263.    On or about July 20, 2016, Crawford and told Goldstein her that he loved her, and called her "baby."

### EE. Supervisor Crawford Insists on More Private Meetings, Against Goldstein's Wishes, on August 3-4, 2016

264.    With no management support for obtaining relief from his harassment, on August 3, 2016, Goldstein invited Supervisor Crawford to "grab a beer."

265.    She planned to invite various coworkers as well.

266.    Crawford offered that they have dinner together.

267.    When Goldstein arrived, Crawford said he had arranged for privacy  because his wife was out of town and he was lonely and wanted to talk to her about her future.

268.    Goldstein immediately became concerned because Crawford told her that he had arranged for a private table so that they could celebrate the success of the study, and said he had picked a special bottle of wine to celebrate.

269.    Crawford then demanded that Goldstein sit closer to him and threatened that he would move his chair and kiss her if she did not move closer.

270.     Goldstein told Crawford that he was making her feel
uncomfortable, thereby demonstrating to him that his conduct was unwelcome.

271.     However, Crawford ignored this and continued to insist that she sit
next to him.

272.     At no point during that evening did Goldstein kiss Crawford or
engage in any consensual physical contact with him.

273.     After dinner, Crawford insisted on driving Goldstein home, but she
refused because, as usual, he was intoxicated, and she feared that he would
become sexually aggressive the moment they were alone in the car and insist on
coming into her home.

274.     Ultimately, Goldstein called for an Uber driver and was picked up
at 8:01 p.m. and taken to her home – without Dr. Crawford.

275.     Dr. Crawford began texting her later that evening that he was upset
that she left because he just wanted to give her a gift.

276.     The next day, August 4, 2016, Crawford admitted in his text
messages that he should not have gotten intoxicated and driven home.

**FF. Goldstein Rejects Crawford's Attempted Gift of a
Necklace, on August 4, 2016**

277.     Supervisor Crawford texted Goldstein that he wanted to meet with
her.

278.     When they met in the office on August 4, 2016, Goldstein
confronted his behavior and states she wants him to stop being inappropriate.

279.    Crawford apologized and said he had had wanted to give her a necklace at Puerto 511, but was angry that she had walked out on him.

280.    Goldstein declined the gift and Crawford became irate, stating "I could not give it to my wife, now can I?"

281.    Crawford threw the necklace across Goldstein's desk.

282.    Goldstein took the necklace and went  next door to co-worker Yarnell's office, where, upset and shaken, she showed her co-worker the necklace and expressed frustration over Crawford's behavior and that she did not know how to stop him from continuing to pursue a relationship with her.

283.     During this time period, Crawford repeatedly complained to Goldstein that he was not happy in his marriage and was looking to have an affair and wanted a woman who would go on trips with him.

284.    Goldstein said she was never going to engage in any relationship with him so he should look elsewhere.

285.    Crawford at one point told her that he would imagine Goldstein when he was having sex with his wife.

286.    Goldstein found this talk repulsive and felt that his behavior was repugnant and disgusting.

GG.    **Supervisor Crawford Texts Goldstein Photos of his Hotel Room and the Hotel Pool, in August 2016, and asks: "You and Me?"**

287.    In **August 2016,** while on a trip to Costa Rica, Crawford texted

photos of his bedroom to Ms. Goldstein.

288.    He also texted a photo from the pool at 11:30 pm, asking **"You and**

**me?"** to which Ms. Goldstein did not respond.

> HH.     **Crawford Complains of "Carly Withdrawal**
>         **Syndrome" and Makes More Sexually Harassing**
>         **Comments**

289.    On August 12, 2016, he pressured Goldstein, "I have Carly

withdrawal syndrome…if not treated promptly i may need to be admitted to an

ICU… are you going to let me die?"

> II.    **Crawford Berates Goldstein in August 15, 2016 Meeting in**
>        **the Presence of Toursavadkohi, Sarkar and Others**

290.    On or about August 15, 2016, Goldstein and Monahan met with

Supervisor Crawford, as well as his superiors, Toursavadkohi and Sarkar.

291.    During this meeting, Crawford berated Goldstein at times and

often ignored her as she spoke, choosing instead to complete work on his laptop.

292.    Crawford repeatedly interrupted Goldstein and only stopped when

Sarkar interceded on Goldstein's behalf and insisted that Crawford behave

appropriately and respectfully.

293.    Crawford proposed that he be appointed chief of clinical research.

294.    Goldstein vocalized her opposition to this in Crawford's presence.

### JJ. Crawford Admits by Text, That Goldstein has not Been Welcoming his Advances

295.    Following this meeting. Dr. Crawford again admitted that Goldstein was not supportive of him, texting her later on the night of the meeting that she "slammed him pretty hard" and he was hurt.

296.    Crawford continued to state that she was ignoring him and then sent an emoji stating, "I know you read that," when she still did not respond.

297.    On August 16, 2016, Crawford texted Ms. Goldstein, admitting that she had not "welcomed" his advances, stating: "I'm looking to get back in your good graces."

298.    Goldstein confirmed the unwelcomeness, stating that all she was seeking from him was respect.

299.    Crawford still insisted pressing his sexual demands, stating: "I respect, like, admire and adore you…you know that."

300.    On August 17, 2016, Crawford continued to press the issue with Goldstein and she addressed his behavior in a message stating, "[n]o you disrespected me in a public meeting in front of all your colleagues. You made sure when I spoke you showed no interest and it came across clear. I wouldn't have cared one on one or something informal, but you embarrassed and certainly belittled me."

301.     Crawford proceeded to call himself an "asshole", suggest she have a drink with him, and to say that he was "saddened" that he made her feel that way.

## KK.     Crawford Uses his Supervisory Powers to Increase his Retaliatory Campaign Against Goldstein

302.     After Goldstein confronted Crawford's behavior in text messages and in person, told him to cease his unwelcome advances and said that she did not want to spend any time alone with him, Crawford became increasingly hostile toward Goldstein, and used his supervisory work status to impede her from doing her job.

303.     For instance, with regard to studies Goldstein was working on, he ignored Goldstein's written work product of the sort of which he would previously sign routinely.

## LL. Sarkar Threatens Goldstein With Reduction to Part Time Status, in August 2016

304.     Sometime in August 2016, Sarkar met with Goldstein, and informed her that Lal's funding was ending and that her full time job might be reduced to part time.

305.     Goldstein responded that this was illogical, since much of her salary was funded by Crawford's research, not Lal's.

306.     Goldstein considered this retaliation.

307.   Sarkar offered Goldstein chocolate, condescendingly saying that his female residents usually come to his office crying and that chocolate usually comforts women.

### MM.   Defendant Incongruously Instructs Crawford to Avoid Contact With Goldstein, While Still Assigning her to his Supervision

308.   On October 27, Crawford was ordered to have no contact Goldstein.

309.   This was in response to the formal demand letter her lawyer had sent.

310.   However, without more this was nonsensical as he was still he supervisor and there was no change in reporting relationships.

311.   To adequately respond to inquiries from the study sponsors, Goldstein needed information from Lal and/or Crawford, but due to the necessary no-contact order,  Goldstein could not communicate directly with either.

312.   Goldstein was told by UM personnel that she needed to forward her complaint on this topic to BREF's Dave Johnson

313.   Goldstein sought guidance regarding this problem from Toursavadkohi, Johnson, and Tricia O'Neal.

314.   They forbade Goldstein from informing the third parties about the no-contact order.

315.    Dave Johnson's response was merely, "just do your best."

316.    When Goldstein inquired about how to respond to these third parties, she was told guidance would be forthcoming, but it was never provided.

317.    With the necessary no-contact order and no further guidance as to how to perform her duties, it was practically impossible for Goldstein to perform her duties.

318.    This added to Goldstein's distress, because it rendered it difficult to perform her duties.

319.    In addition, Goldstein was being separated from the very individuals upon whom she was counting to obtain graduate school recommendations.

320.    In late fall 2016, Goldstein was notified that the investigation into her allegations would be forthcoming in February 2017.

### NN.    Defendant Continues the Sexually and Retaliatorily Hostile Work Environment, Including by Spreading False and Salacious Rumors Against Goldstein, and by Spreading the Word That she had a Consensual Relationship With Crawford

321.    Meanwhile, Goldstein was repeatedly confronting rumors humiliating rumors about herself.

322.    Specifically, coworkers and/or interns would inform Goldstein directly that they heard she had a voluntary affair with Crawford, or just made comments like "I hear you two were kissing."

323.     Goldstein was also repeatedly told that Crawford was trying to access her.

324.     Goldstein heard Crawford hired a private detective to investigate Goldstein's whereabouts.

325.     She was also told by one research trainee that Crawford kept seeking disclosure of Goldstein's schedule.

326.     Goldstein was informed during this period by trainees that Crawford requested that they take photos of Goldstein.

327.     Crawford's ongoing invasions of her privacy contributed to the ongoing hostile environment.

### OO.     Goldstein Further Formally Protests the Crawford and Pangahat Sexual Harassment, in November 2016 and Thereafter, and Again Meets With the  Title IX Office

328.     On November 3, 2016 a letter was forwarded from the law office of Andrew M. Dansicker LLC,  to Ms. Alana Kyriakakis, Esq., University Counsel and Ms. Bonnie M. Muschett, Esq., University Title IX Coordinator, informing of potential sexual harassment and retaliation claims against the University, on behalf of Goldstein.

329.     Both Crawford and Panghat were referenced as harassers.

330.     Upon information and belief, on November 15, 2016, Dr. Crawford was notified about this complaint.

331.    On November 28, 2016, Goldstein met with University Compliance Specialist Latoya Lewis,  Assistant Vice President Tricia O'Neil, and BREF's David E. Johnson, Ph.D., who facilitated the interview meeting and was present during the discussions.

332.    Goldstein once again protested both the Panghat and Crawford sexual harassment.

333.    O'Neil explained the mandatory reporting requirements set forth at website www.umaryland.edu/egualaccess!nondiscriminationpolicies/title-ix-related-policies/.

### PP. University Defendants Fail to Correct Crawford's Harassment of Erin Hanlon

334.    On or around Dec. 26, 2016, Sarkar met with Erin Hanlon, a Physician's Assistant in vascular surgery, who worked under Crawford at the University's Medical Center.

335.    Sarkar alerted Hanlon that he had received an email from the University of Maryland Medical System's Chief Nursing Officer Lisa Rowen, stating that Rowen had received a complaint that Crawford had sexually assaulted Hanlon.

336.    Sarkar told Hanlon that he heard that Crawford may have behaved improperly.

337.   Sarkar explained that Hanlon should feel safe and feel free to go to HR if there was an issue.

338.   Hanlon had also been subjected to Crawford's inappropriate comments, including, for instance: "the only reason you got this job is because you're pretty and have a nice ass."

339.   Thus, as with Goldstein, the Saleswoman and Hoehn, the University Defendants failed to act to prevent and/or correct the hostile work environment inflicted against Hanlon.

QQ.   **Goldstein is Subjected to an Ongoing Hostile Environment After she Lodges her Fall 2016 Protests, Including Subjecting her to a Private Investigator a False Rumors of a Sexual Relationship With the Harasser Crawford; Sarkar Admits Recognition That Crawford Sexually Harassed Goldstein**

340.   On January 10, 2017, Goldstein notified Tricia O'Neil that Dr. Crawford contacted an ex-boyfriend of Goldstein's and a trainee told her that "he was talking about hiring private investigator to follow [Goldstein]."

341.   At this point Goldstein was hearing new rumors almost every day, and hearing questions from sponsors every day that she could not address.

342.   Goldstein also notified O'Neil that she was told that Crawford called a product representative-- whom Goldstein had briefly dated--to request that the representative falsely claim Goldstein would get drunk and go home with random men.

343.    Crawford was also falsely telling residents that he had a prior sexual relationship with Goldstein.

344.    Specifically, one employee in training told Goldstein that Crawford told her that he and Goldstein had been "hooking up for a long time."

345.    Goldstein told Toursavadkohi about these hurtful rumors, crying.

346.    Toursavadkohi responded that Goldstein should hold her head high and go about her day, ignoring the rumors.

347.    Goldstein noticed that various surgeons and administrative staff were very cold towards her, and she suspects that may be due to adverse rumors they heard.

348.    Sometime in February 2017, Sarkar admitted to Hoehn that there was enough evidence to know that Crawford did harass Goldstein, but that he knew the Title IX office would write it up to indicate it was a consensual relationship.

349.    A draft of the University's Title IX Report was provided to Goldstein in mid-April 2017, and contains many inaccuracies and key omissions, some of which are described herein.

350.    On April 13, 2017, Alana Kyriakakis, UMB legal counsel, stated in writing to Goldstein that a second report would be issued in a day or two responding to the claims of retaliation and specifically of Crawford's threat to Goldstein's career.

351.    However, no such report was ever issued even though Goldstein wrote to the University requesting it.

352.    This greatly exacerbated Goldstein's distress.

353.    On June 5, 2017, the University asserted that the result of its investigation was that it could not find that any hospital policy violation occurred, adding still further to Goldstein's distress.

### RR.    Goldstein Files EEOC Charges

354.    On February 3, 2017, Goldstein filed charges of discrimination with EEOC (cross filed with the Baltimore Community Relations Commission) against the University of Maryland School of Medicine (UMB).

355.    On March 24, 2017, Goldstein filed charges of discrimination with EEOC (cross filed with the Maryland Commission on Civil Rights) against BREF/VA Medical Center.

356.    However, the harassment against Goldstein continued until she separated from the employment in April 2017, and even after.

357.    Thus, in July 2017, Goldstein received harassing calls from Crawford's wife.

### SS. Goldstein Resigns due to the Intolerable Conditions

358.    Under unrelenting pressure, Goldstein resigned from her position, which paid $52,000.00 per year, in April 2017, and took a job elsewhere for $27,000.00.

TT.       **The University Whitewashes the Hostile Environment, Finding Virtually Simultaneously That Neither Goldstein nor Hanlon was Subjected to a Hostile Work Environment, While Hoehn's Employment Ended**

359.    Melanie Hoehn ended her employment in June 2017.

360.    On June 5, 2017, the University wrote Hanlon that they investigated and were unable to conclude that a violation of hospital policy occurred.

361.    On June 9, 2017, the University wrote Goldstein that it investigated and could conclude by a preponderance of the evidence, that Ms. Goldstein was not subjected to unwelcome sexual harassment by Dr. Crawford.

362.    Self-servingly, the University concluded that Crawford engaged in a personal relationship that extended beyond the workplace and often included drinking, possibly driving while intoxicated, and generally showing poor judgment for someone in his position."

363.    The University added to Goldstein's stress by falsely portraying her in its report as a bitter ex-girlfriend.

364.    Indeed, the University falsely twisted Goldstein's text messages to Crawford, which were intended to placate Crawford and somehow survive in her job, as expressions of interest in a sexual relationship with him.

365.    This mistreatment added to Goldstein's distress.

366.    Goldstein observed other women's internal sexual harassment complaints being ignored, belittled and/or covered up by the University, further adding to her feelings of isolation and indignity.

## STATEMENT OF CLAIMS

**COUNT I:   UNLAWFUL HOSTILE WORK ENVIRONMENT IN THE FORM OF A CONTINUING VIOLATION, BASED ON SEX, IN VIOLATION OF THE EDUCATION AMENDMENTS OF 1972 ("TITLE IX"), 20 U.S.C. §§ 1681-1688,  42 U.SC. 2000e ET. SEQ. (TITLE VII), 42 U.S.C. 2000D ET. SEQ ("TITLE VI"), AND THE MARYLAND FAIR EMPLOYMENT PRACTICES ACT ("FEPA"), MD. CODE ANN., STATE GOV'T § 20-1001 *ET SEQ.*, AGAINST THE UNIVERSITY DEFENDANTS AND BREF**

367.    Goldstein incorporates by reference all the above paragraphs hereto.

368.    The Civil Rights Act, Titles VI, VII and IX, and the Maryland FEPA, forbid infliction of a hostile work environment against an employee on account of sex.

369.    The facts described above and others, together show the necessary severe or pervasive hostility to Goldstein.

370.    The University of Maryland School of Medicine, a unit of the University of Maryland, and UMB, were "joint employers" of Goldstein.

371.    Thus, they  had the authority to remove Goldstein from her contract, and thereby effectively terminate her employment.

372.    Goldstein was supervised day-to-day by University of Maryland employees, including Drs. Robert Crawford, Dr.  Shahab Toursavadkohi and Brajesh Lal, all under the authority of their Chief, Dr. Rajabrata Sarkar of the University.

373.    The University Defendants had full control over the location to which Goldstein reported for duty, and significant control over the equipment she used, and with what duties she performed.

374.    University managers made decisions as to Goldstein's pay rates, along with decisions about any bonuses she received.

375.    During the time period of the harassment, namely 2014 and 2017, all of Goldstein's professional work was focused exclusively on the assignments controlled by the University Defendants.

376.     Any training or guidance was provided directly by the above-named managers, or other individuals employed by the University Defendants.

377.    The University  had authority to evaluate Goldstein's performance.

378.    Professionally, Goldstein was treated as a University employee.

379.    Although University paid her indirectly, namely through the contractor BREF, her day to day experience was definitively akin to a regular employee relationship.

380.    Ms. Goldstein had no supervisors or managers (nor did she receive any duties from any individuals) other than those employed by the University.

381.    In addition, under the United States Supreme Court's decision in *AMTRAK v. Morgan*, 536 U.S. 101 (2002), "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."

382.    Here, the hostile work environment pattern includes acts beginning in April 2014 and continuing through 2017, thereby constituting an actionable continuing violation.

383.    Goldstein protested the hostile environment to David E. Johnson, PhD, the Executive Director of BREF, in the January 2016 meeting described above.

384.    Neither Johnson nor any other BREF manager took sufficient steps to protect Goldstein from sexual harassment and retaliation thereafter.

385.    To the extent that BREF may contend that it declined to act in support of its employee, Goldstein, because of the preferences of  its customer, the University, to tolerate harassment and retaliation, such defense cannot lawfully shield BREF from liability. *Williams v. G4S Secure Solutions (USA), Inc.*, 2012 U.S. Dist. LEXIS 66249 (D. Md. May 11, 2012) (Hollander, J.)

386.    By failing to protect Goldstein from unwelcome, severe, pervasive sexual harassment while performing work at the VA Medical Center for the University, and while on the payroll of BREF, Defendant BREF violated Titles VI, VII and IX of the Civil Rights Act and the Maryland FEPA, Md. Code Ann., State Gov't § 20-1001 *Et Seq.*

387.    By subjecting Goldstein to unwelcome, severe, pervasive and continuing sexual harassment, and failing to prevent or correct that harassment sufficiently, Defendants violated Titles VI, VII and  IX of the Civil Rights Act and

the Maryland FEPA, Md. Code Ann., State Gov't § 20-1001 *Et Seq,* thereby

causing her damages, both financial and emotional.

388.    Defendants' actions were taken with malice and/or in reckless

disregard to Goldstein's rights.

**COUNT II:   UNLAWFUL RETALIATION IN VIOLATION OF THE EDUCATION AMENDMENTS OF 1972 ("TITLE IX"), 20 U.S.C. §§ 1681-1688,  42 U.SC. 2000e ET. SEQ. (TITLE VII), 42 U.S.C. 2000D ET. SEQ ("TITLE VI"), AND THE MARYLAND FAIR EMPLOYMENT PRACTICES ACT ("FEPA"), MD. CODE ANN., STATE GOV'T § 20-1001 *ET SEQ.*, AGAINST THE UNIVERSITY DEFENDANTS AND BREF**

389.    Goldstein  incorporates all the above paragraphs by reference.

390.    Under the U.S. Supreme Court's ruling in *Burlington Northern*, a

retaliatory action can form the basis of a claim if it would tend to deter

employees or others from making a discrimination complaint.

391.    As discussed above, Crawford demanded that Goldstein grant him

a date as a condition of his providing assistance with her completion of work

tasks.

392.    Crawford also attempted to fire Goldstein just after his attack

against her at The Brewer's Art.

393.    Crawford also threatened a fellow for attempting to help Goldstein.

394.    Crawford also demanded that Goldstein withdraw her complaint

regarding that attack

395.   Defendant also admitted anger at Goldstein for protesting Panghat's sexual harassment and made numerous other admissions of its retaliatory animus.

396.   For instance, in the August 15, 2016 meeting, Crawford berated Goldstein in the presence of their superiors, after she had persisted in rejecting his advances.

397.   It is unlawful under Titles VI, VII and IX of the Civil Rights Act, and the Maryland FEPA, for an employer and/or recipient of federal financial assistance, to retaliate against an employee or other person  for taking protected actions against it.

398.   Plaintiff Goldstein  opposed the sexual harassment being inflicted upon her, by repeatedly telling the harassers to stop, by informing various of Defendants' responsible officials, such as Sarkar and Toursavadkohi to remedy the problem, by protesting to Defendant's Title IX office and by filing charges with the EEOC.

399.   She also opposed *retaliatory* actions taken against her through similar means.

400.   Defendants undertook further retaliatory actions thereafter, on account of Goldstein's protest.

401.   Based on at least these actions, Defendants have acted in a manner that could easily deter a reasonable employee from protesting sexual harassment.

402.     Accordingly, Defendants have violated the anti-retaliation provisions of Title VII, Title IX and the Maryland FEPA.

403.     Defendants' conduct amounts to both retaliation through independent hostile actions, and a retaliatory hostile work environment that also constitutes a continuing violation.

404.     Defendants have thereby caused Goldstein damages, both financial and emotional.

**COUNT III:  DISCRIMINATORY, RETALIATORY CONSTRUCTIVE DISCHARGE  IN VIOLATION OF THE EDUCATION AMENDMENTS OF 1972 ("TITLE IX"), 20 U.S.C. §§ 1681-1688,  42 U.SC. 2000e ET. SEQ. (TITLE VII), 42 U.S.C. 2000D ET. SEQ ("TITLE VI"), AND THE MARYLAND FAIR EMPLOYMENT PRACTICES ACT ("FEPA"), MD. CODE ANN., STATE GOV'T § 20-1001 *ET SEQ.*, AGAINST THE UNIVERSITY DEFENDANTS AND BREF**

405.     Goldstein  incorporates all the above paragraphs by reference.

406.     Under both 42 U.S.C. § 2000e et seq. (Title VII of the 1964 Civil Rights Act) and the Maryland FEPA, in a hostile environment case, additionally alleging constructive discharge requires: "deliberateness of the employer's action, and intolerability of the working conditions." *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985)(emphasis added).

407.     Alternatively, "a failure to act in the face of known intolerable conditions …" also suffices. *Id*.

408.     As shown above, Goldstein finally resigned and left her position with the University at the VA for a lower-paying job, because it had been made

abundantly clear that the sexually and retaliatorily hostile environment she was experiencing was not going to be rectified.

409.    By constructively discharging her on account of her sex, Defendants unlawfully discriminated and retaliated against Goldstein in violation of Title VII, Title IX and the Maryland FEPA, thereby causing her harms, both financial and emotional.

## REQUEST FOR RELIEF

**WHEREFORE, the Plaintiff, Ms. Goldstein, prays that the Court grant her the following relief:**

(a)    Reinstatement to her position, with full back pay and benefits.

(b)    Compensatory damages, in an amount to be determined by the jury in accordance with the proof at trial, for the emotional and consequential harms caused by Defendants;

(c)    Punitive damages against Defendant BREF;

(d)    Prejudgment and post judgment interest;

(d)    Reasonable attorneys' fees, expenses and costs;

(e)    Posting of notices on Defendants' premises notifying employees that Defendants have violated the anti-discrimination laws, and that employees who report future violations may not be subject to retaliation;

(f)    Injunctive relief, including but not limited to: forbidding Defendant from further circulation of scurrilous false rumors about Ms. Goldstein, court review of the processes and procedures of the Title IX office to assure that it meets its mandate in the future, including providing all necessary training; and

(g)    Such other relief as the court shall deem just and proper.

## JURY TRIAL DEMAND

The Plaintiff demands that this case be tried by a jury.

Respectfully submitted,

THE GOLDSMITH LAW FIRM, LLC

/S/

_____

Leizer Z. Goldsmith
5335 Wisconsin Avenue NW Suite 440
Washington, D.C. 20015
Telephone: (202) 895-1506
Facsimile: (202) 318-0798
Email: lgoldsmith@goldsmithfirm.com
Attorney for Plaintiff Carly Goldstein