**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

CARLY GOLDSTEIN,                     *

       Plaintiff,                     *

     v.                                    *          Case No. 1:18-cv-02376-CCB

UNIVERSITY OF MARYLAND        *
SCHOOL OF MEDICINE, et al.,
                                             *          **Request for Hearing**

       Defendants.                     *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**UNIVERSITY OF MARYLAND'S MOTION TO DISMISS**
**OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

BRIAN E. FROSH
Attorney General of Maryland

C. Alexander Hortis (Bar No. 28522)
Assistant Attorney General
Educational Affairs Division
200 St. Paul Place, 17th Floor
Baltimore, Maryland 21202-2021
Phone: (410) 576-6320
Fax: (410) 576-6437
Email: ahortis@oag.state.md.us

*Attorneys for Defendants University of*
*Maryland School of Medicine and*
*University of Maryland, Baltimore*

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 2

I.      BREF and Federal Research at the Baltimore VA Medical Center ................................... 2

II.     The VA Appointments of Dr. Crawford and Dr. Lal to Conduct Federal Research at the Baltimore VA Medical Center ................................................................. 4

III.    Plaintiff's BREF Work Performing Intake of VA Patients and Data Entry on Federal Equipment at the Baltimore VA Medical Center.................................................. 5

IV.     In December 2015, Plaintiff Complains to BREF and the VA about Alleged Sexual Harassment by Dr. Lijo Panghat; the University Agrees to Terminate Dr. Panghat's Fellowship Less Than One Month Later in January 2016 .................................. 7

V.      In October 2016, Plaintiff Complains to the University of Maryland's Title IX Office About Alleged Sexual Harassment by Dr. Crawford ........................................... 8

VI.     In October 2016, the University's Title IX Office Conducts an Investigation, Reviews Plaintiff's 4,572 Text Messages, Finds They Had a Social Relationship Outside Work, But Decides Not to Renew Its Contract with Dr. Crawford...................... 9

VII.    Before the Title IX Report was Issued, Plaintiff Filed a Charge of Discrimination in February 2017 and Resigned in April 2017 ................................................ 11

LEGAL STANDARD.......................................................................................... 12

ARGUMENT ..................................................................................................... 12

I.      Plaintiff's Entire Case Against the University of Maryland Fails Because It Was *Not* Plaintiff's "Joint Employer" when She Worked for BREF on Federal Research with VA Patients at the Baltimore VA .......................................................... 13

        A.      The Court Should Recognize that Plaintiff Worked with VA-Appointed Doctors on Federal Research in Their Capacities as Federal VA Employees ...................................................................................... 14

        B.      Plaintiff Cannot Show that the University of Maryland Was Her Joint Employer While She Worked on Federal Research at the Baltimore VA ........... 16

II.     The Court Should Dismiss the Title VI Race Discrimination Claim in Each Count........ 21

III.    The Court Should Dismiss the Count I Hostile Work Environment Claims For Lack of Subject Matter Jurisdiction and on Deliberate Indifference ......................... 22

        A.      Plaintiff Failed to Exhaust Administrative Remedies Where Her Charge of Discrimination Referenced Different Time Frames and Actors than She Alleged in the Complaint ................................................................. 22

B.      Plaintiff Cannot Satisfy Title IX's High Bar of Actual Knowledge and Deliberate Indifference, Where the University of Maryland's Title IX Office Promptly Investigated Plaintiff's Complaints and Removed Two Individuals.......................................................................................................... 24

IV.     Plaintiff's Count II Does *Not* Plead a Cognizable Claim of Retaliation ......................... 27

A.      Plaintiff Has *Not* Alleged "Retaliation" for Protected Activity, But *Quid Pro Quo* Claims Without Tangible Adverse Employment Actions............................ 27

B.      Count II's Retaliation Claims under Title VII and MFEPA are Time-Barred and Fail to Plead Essential Elements .................................................................. 28

C.      The Title IX Retaliation Claims Do *Not* Plead Facts to Show Actual Knowledge and Deliberate Indifference by the University of Maryland ............ 30

V.      Plaintiff's Count III for Constructive Discharge Does *Not* Plead Facts to Show Deliberateness and Intolerability of Conditions at the University of Maryland............... 30

A.      The Court Lacks Subject Matter Jurisdiction over the Constructive Discharge Claim............................................................................................ 31

B.      Plaintiff Has *Not* Pled Deliberateness by the University of Maryland ................ 31

C.      Plaintiff Has *Not* Pled an Objective Intolerability of Conditions ......................... 32

CONCLUSION.................................................................................................................... 33

Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 56(a), Defendants University of Maryland School of Medicine and University of Maryland, Baltimore (collectively, "the University of Maryland" or "the University") respectfully submit this memorandum of law in support of their Motion to Dismiss or, in the Alternative, for Summary Judgment, as to the complaint of Plaintiff Carly Goldstein ("Plaintiff" or "Ms. Goldstein").

## INTRODUCTION

From 2013 to 2017, Plaintiff was employed by the Baltimore Research and Education, Inc. ("BREF") at the Baltimore VA Medical Center.  Compl. ¶¶ 9, 19 [ECF 1].  BREF was created by Congress for "medical research within the VA Medical Health Care System." *Id.* ¶ 5.  Plaintiff performed intake of VA patients and data entry on federal equipment in her office at the Baltimore VA.  BREF "issued Goldstein's paychecks and considered her its employee." *Id*. ¶ 20.

Plaintiff was not an employee of the University of Maryland.  Plaintiff had no office or personnel file at the University.  She was never on the Central State Payroll.  To the contrary, the University of Maryland had in fact rejected Plaintiff's application for a job there in 2014.

Nevertheless, Plaintiff now claims that the University of Maryland was her "joint employer."  Plaintiff's case rests entirely on the fact that, while at the Baltimore VA Medical Center, she worked with some doctors who also held part-time faculty positions at the University of Maryland.  This omits the crucial fact that these doctors were also ***federal VA employees*** who were working on ***federal research grants*** in their ***capacities as researchers for the Baltimore VA***.

The University of Maryland will consider allegations of sexual harassment against any of its own employees fled by anyone, including complaints filed by employees and nonemployees alike.  Thus, in October 2016, the University's Title IX office investigated a complaint filed by Plaintiff, as a non-University employee, alleging that Dr. Robert Crawford sexually harassed her.  Far from being indifferent, the Title IX office helped Plaintiff to file her complaint with its office.

The University's Title IX office conducted a thorough investigation of Plaintiff's allegations against Dr. Crawford.[1]  During the Title IX investigation, Plaintiff submitted 4,572 text messages that she and Dr. Crawford had exchanged with each other.  Based on this documentation and the witness interviews, the University concluded that they had a "professional and personal relationship" in which both "parties acknowledge that their encounters frequently involved alcohol" and that "their drinking was sometimes to excess."  **Exh. 3C**: Final Report, at 10.  The Title IX report found that "their relationship voluntarily extended beyond that of strictly work colleagues, and that Dr. Crawford could reasonably conclude that his advances were not unwelcome."  *Id.*  Thus, the report did not conclude, by a preponderance of the evidence, that Plaintiff was subjected to sexual harassment by Dr. Crawford.  *Id.*  Nonetheless, the report found Dr. Crawford had shown poor judgment (*id.*), and thereafter the University elected to not renew his faculty contract.

Simply put, the University of Maryland does not belong in this suit.  The University of Maryland was not Plaintiff's "joint employer" and all employment law claims against it fail as a matter of law.  In addition, the University took reasonable steps to investigate the difficult situation caused by Plaintiff's and Dr. Crawford's social relationship and therefore fulfilled its legal obligations even if Plaintiff had been a University employee.   Accordingly, the Court should dismiss or grant summary judgment to the University on each claim.

## BACKGROUND

### I.    BREF and Federal Research at the Baltimore VA Medical Center

The Baltimore Research and Education Foundation, Inc. ("BREF") is a tax exempt entity created for medical research with veterans within the Veteran's Administration Medical Health

---

[1] As shown below, the report noted Ms. Goldstein was not an employee of the University, but was instead employed at BREF, where she interacted with researcher at the VA. **Exh. 3C**: Report.

Care System.  Compl. ¶¶ 5, 19 [ECF 1].  Plaintiff entered into her position with BREF at its offices "located at the Baltimore VA Medical Center during 2013." *Id.* ¶ 19.  At all relevant times in this case, BREF "issued Goldstein's paychecks and considered her its employee." *Id.* ¶ 20.

As background, in 1988, Congress statutorily authorized nonprofit entities such as BREF for research projects with VA patients at the Baltimore VA Medical Center.  38 U.S.C. § 7361 *et seq.*; Compl. ¶ 5.  The Secretary of the Department of Veterans Affairs is authorized to establish "at any Department medical center of a nonprofit corporation to provide a flexible funding mechanism for the conduct of approved research and education at the medical center." 38 U.S.C. § 7361(a) (emphasis added).  Research must be in "connection with the provision of medical care and treatment to veterans." *Id.* § 7362(a) *cross-referencing id.* § 7303(a)(1).[2]

BREF and the VA maintain control over the research and funds at the Baltimore VA Medical Center.  BREF retains the authority to "accept, administer, and spend funds" for BREF employees and VA research.  *Id.* § 7364(a)(1)(A).  No research funds may be spent "unless the activity is approved in accordance with procedures prescribed by the Under Secretary for Health" of the VA.  *Id.* § 7364(d).  BREF's website states:  "All research projects administered by the BREF must be approved by the VAMHCS Research and Development (R&D) Committee" of the VA Maryland Health Care System.  **Exh. 2**: Decl. of Dr. Brajesh Lal ("Lal Decl.") ¶ 8; **Exh. 2C**: BREF website.

BREF and the VA retain control over the personnel who work on research projects at the Baltimore VA Medical Center.  Congress designated BREF as having the power to "employ such employees as [BREF] considers necessary for such purposes and fix the compensation of such

---

[2] The Court may take judicial notice of these statutes and other public records.  *See U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014).

employees." 38 U.S.C. § 7364(a)(1)(1)(A).  BREF's Executive Director must review and approve any requests for hires.  **Exh. 2**: Lal Decl. ¶ 11: **Exh. 2C**:  BREF website.  Thus, BREF is a completely separate entity from the University, with its own personnel.   Pursuant to these requirements, Plaintiff was hired by BREF to work at its permanent location in the Baltimore VA Medical Center.  Compl. ¶ 19.

## II.  The VA Appointments of Dr. Crawford and Dr. Lal to Conduct Federal Research at the Baltimore VA Medical Center

BREF and the VA also maintain personnel authority over the investigators who conduct research at the Baltimore VA Medical Center.  As BREF's website states: "BREF investigators must hold a VA appointment."  **Exh. 2C**:  BREF website.  Even as VA employees, an investigator lacks power to hire BREF employees.  As BREF's website states: **"Investigators cannot make job offers on behalf of BREF**."  **Exh. 2C**: BREF website, at ¶7  ("**7. Hiring Employees**") (bold in original) (bold in original); **Exh. 2**: Lal Decl. ¶ 11.  Investigators likewise do not have the authority to terminate BREF employees regardless of whether they are the principal investigator on a federal grant that is overseen by the VA.  *Id.*  ¶ 17.

The VA granted federal appointments to Dr. Robert Crawford and Dr. Brajesh Lal, who were each vascular surgeons, to conduct federal research at the Baltimore VA Medical Center. *Id.* ¶¶ 4-5 & 10; **Exh. 4**: Decl. of David Ingle ("Ingle Decl.") ¶¶ 4-5.  Dr. Crawford and Dr. Lal were both federal VA employees who were each paid federal salaries for their research at the Baltimore VA.  **Exh. 2**: Lal Decl. ¶ 5&10.  Their VA employment and salaries are memorialized each in a Memorandum of Understanding.  **Exh. 4B**:  Lal MOU; **Exh. 4C**:  Crawford MOU. During their research at the Baltimore VA, Dr. Crawford and Dr. Lal were acting in their capacities as VA employees on federal payrolls.  **Exh. 2**: Lal Decl.  ¶¶ 5-6 &10.

Dr. Crawford and Dr. Lal separately also held part-time faculty appointment at the University of Maryland, Baltimore.   Dr. Crawford was a part-time faculty member in the Department of Surgery at the University of Maryland.   **Exh. 4C**; Compl. ¶ 25.[3]   Dr. Lal was and is a part-time Professor of Surgery at the University of Maryland.   **Exh. 2**: Lal. Decl.  ¶¶ 2 & 5 While working as University of Maryland faculty, they were paid as State employees.   *Id.* at 5; **Exh. 4B**; **Exh. 4C**.

### III.   Plaintiff's BREF Work Performing Intake of VA Patients and Data Entry on Federal Equipment at the Baltimore VA Medical Center

Consistent with BREF's purposes, Plaintiff worked as a research coordinator at the Baltimore VA Medical Center.   Compl. ¶ 21.   Plaintiff's primary role was performing intake of VA patients.   Lal Decl. ¶ 12.   Plaintiff would help VA patients fill out paperwork, ask questions about their health, and do basic "peg board" dexterity tests.   *Id.*   Plaintiff was trained in these intake procedures by Dr. Moira Dux, a full-time VA employee.   *Id.*

Although the Complaint vaguely asserts the University had "full control over the location," it alleges no facts to support this conclusion.   Compl. ¶ 373.   Plaintiff acknowledged earlier in the pleadings that BREF was located within the Baltimore VA Medical Center and her work site was at the VA.   *Id.* ¶¶ 19, 22.   Plaintiff's office space was at the VA.   **Exh. 2**: Lal. Decl.¶ 13.   This is all federal property owned by the VA.   *Id.*

The Complaint also asserts the University had "significant control over the equipment," but alleges no facts to support this conclusion.   *Id.* ¶ 373.   Plaintiff was assigned a VA e-mail address ending in "va.gov."   **Exh. 3**: Decl. of Tricia O'Neill ("O'Neill Decl.") ¶ 5; **Exh. 5C**: E-

---

[3] Separately, Dr. Crawford was also a co-director of the Center for Aortic Diseases at the University of Maryland Medical System ("UMMS"), a private hospital that is not a defendant in this case. *Available at*:  https://egov. maryland.gov/BusinessExpress/EntitySearch.

mail. The VA owned the equipment that Plaintiff used, including the VA forms, the peg boards, and computers on which she did data entry.  **Exh. 2**: Lal Decl. ¶ 13.

BREF maintained all of Plaintiff's employment records, including her BREF payroll, employment insurance, and payroll taxes.   Compl. ¶ 20; **Exh. 5**: Decl. of Juliet Dickerson ("Dickerson Decl.") ¶ 5.  The University of Maryland conversely has no employment personnel file for Plaintiff (other than a rejection letter).  *Id.*  Plaintiff was never been a University employee on the Central State Payroll.  *Id.*  In January 2014, Plaintiff had applied for and was rejected for a position at the University of Maryland.  *Id.* ¶ 4.[4]

The Complaint alleges that "in or around March 2014, Goldstein's job assignments and work were directly managed and supervised on a daily basis by Dr. Robert S. Crawford and Dr. Brajesh Lal…."  Compl. ¶ 22.   The Complaint does not disclose that Dr. Crawford and Dr. Lal were also paid federal employees of the VA.  **Exh. 2**: Lal Decl. ¶¶ 5-6 & 10; **Exh. 4B**; **Exh. 4C**.  Plaintiff also refers to some interactions with Dr. Shahab Toursavadkohi.  Compl. ¶¶ 100-104.   Dr. Toursavadkohi held a VA appointment for federal research at the Baltimore VA as well.  **Exh. 4A**: Toursavadkohi MOU; **Exh. 2**:  Lal Decl. ¶ 10.   Dr. Crawford's, Dr. Lal's, and Dr. Toursavadkohi's research work, in which they interacted with Plaintiff, was in their capacities as federal researchers at the VA.  *Id.* ¶¶ 5-6 & 10-11.

Between 2014 and 2017, Dr. Lal was a practicing surgeon and had many ongoing clinical responsibilities.  *Id.* ¶ 16.   Neither Dr. Lal nor Dr. Crawford could have possibly managed Plaintiff on a daily basis for ordinary research duties between 2014 and 2017.  *Id.*  Dr. Lal typically only met once a week with Plaintiff to discuss federal compliance and other research matters at the Baltimore VA.  *Id.*

---

[4] *See* **Exh. 5A**: Letter (Jan. 29, 2014).

**IV.     In December 2015, Plaintiff Complains to BREF and the VA about Alleged Sexual Harassment by Dr. Lijo Panghat; the University Agrees to Terminate Dr. Panghat's Fellowship Less Than One Month Later in January 2016**

Plaintiff has alleged that she was sexually harassed by: (1) Dr. Lijo Panghat; and (2) Dr. Robert Crawford.  In both instances, Plaintiff delayed reporting the alleged harassment to the University of Maryland's Title VII office.  After being notified, the University would ultimately terminate its affiliations with both of them.

Plaintiff alleges that in October 2015, Dr. Lijo Panghat, a post-doctoral research fellow, repeatedly sent Goldstein text messages seeking dates and walked her home.  Compl. ¶¶ 131, 165, 175.  Plaintiff delayed reporting this to any official until December 2015 when she went to BREF: "On or around December 11, 2015, Goldstein went to management at BREF and the Veterans Administration and reported the ongoing harassment she was suffering."  *Id*. ¶ 172.

When the University of Maryland's Title IX Office was notified of the alleged conduct in January 2016, University officials promptly terminated Dr. Panghat.  As Plaintiff admits: "Panghat was removed from his post-doctoral fellowship by the University shortly thereafter."  *Id.* ¶  175.  The University terminated Dr. Panghat's fellowship in January 2016.  **Exh. A**: Lal Decl. ¶ 20.

In response to its prompt remedial action, the University of Maryland was sued by Dr. Panghat for alleged wrongful termination in the Circuit Court of Maryland.  *See Dr. Lijo Panghat v. University of Maryland, Baltimore*, Case No. 24-C-17-003267 (Balt. Cir. Ct. 2017).[5]

---

[5] The Court may take judicial notice of these court records on Maryland Judiciary Case Search.  *Available at*:  http://casesearch.courts.state.md.us/casesearch /inquiryDetail.jis?caseId= 24C17 003267&loc=69&detailLoc=CC; *Kitchings v. Shelton*, 2018 WL 398285, at *1 n.4 (D. Md. Jan. 12, 2018) ("I take judicial notice of the state court docket on the Maryland Judiciary Case Search website…").  Dr. Panghat's case is now on appeal to the Court of Special Appeals.

**V.     In October 2016, Plaintiff Complains to the University of Maryland's Title IX Office About Alleged Sexual Harassment by Dr. Crawford**

Plaintiff alleges that she was subject to unwelcome advances and sexual harassment by Dr. Robert Crawford.  In Plaintiff's Charge of Discrimination against the University of Maryland School of Medicine in February 2017, she stated that the dates of discrimination took place at the earliest by "05-03-2016" and at the latest by "01-31-2017."  **Exh. 1**:  Charge.  The Charge read:

> I began my employment with the above referenced employer on January 1, 2012. ***Beginning in April, 2016, Dr. Robert Crawford***, supervisor, subjected me to unwelcome physical sexual advances and comments, placing his hand on my legs and repeatedly demands I join him for a drink after work hours.  In May, 2016, Dr. Crawford started sending me romantic text messages, asking me to send him my personal photographs, buying me jewelry and sending me photos from his family vacations.  I notified senior supervisor Dr. Shahab Tousavadkobi, he stated I should try to continue to say no and avoid running to Dr. Crawford.  Dr. Tousavadkobi did nothing and failed to notify Repondent human resources.  Dr. Crawford and Dr. Brajesh Lal, supervisor, began retaliating against me, Dr. Crawford threatened to remove me from the division and Dr. Lal threatened to cut funding for the research work I was assigned, so that I could lose my employment.

*Id*. (emphasis added).[6]  The Charge stated nothing about Dr. Panghat.

Plaintiff now alleges in the Complaint that Dr. Crawford started harassing here two years earlier starting "around April 2014."  Compl. ¶ 49.  Additionally, Plaintiff now alleges that, in 2013, Dr. Rajabrata Sarkar allegedly made a sexual comment in her presence (*id*. ¶ 33), and was allegedly present for suggestive comments by Dr. Crawford.  *Id*. ¶ 38.  The Complaint adds new allegations by or about a Melanie Hoehn and Erin Hanlon.  *Id*. ¶¶ 92-93 & 338-339.

Many of Plaintiff's allegations of unwelcome advances occurred at bars and restaurants. The Complaint alleges that in August 2014, Dr. Crawford drove Plaintiff in his car "to a local bar under the pretense" it was work-related.  *Id*. ¶ 53.  In November 2014, Dr. Crawford allegedly

---

[6] Plaintiff alleges that, in August 2016, she was subject to "retaliation" when she was informed that Dr. Lal's funding was ending.  However, VA grant funding is on a strict timetable and the draw down of funds is out of the control of investigators.  **Exh. 2**: Lal. Decl. ¶ 17.

interrupted Plaintiff's dinner at Camden Pub.  *Id.* ¶ 72.  In November 2015, "Crawford and Goldstein met at The Brewer's Art, a restaurant in Baltimore."  *Id.* ¶ 132.  In July 2016, Dr. Crawford allegedly engaged in unwelcome touching with her at Restaurant Pazo.  *Id.* ¶¶ 256-60.

The Complaint alleges that in summer 2015, Plaintiff initially told Dr. Toursavadkohi about the allegedly unwanted advances by Dr. Crawford.  *Id.* ¶¶ 100-103.  The Complaint states that Dr. Toursavaskohi never notified BREF, the VA, or the University's Title IX office.  *Id.* ¶ 104. As the Complaint alleges: "Toursavadkohi failed to investigate, report the matter to Human Resources, or do anything…."  *Id.* ¶ 157.

The University's Title IX Office was not notified of Plaintiff's allegations of sexual harassment by Dr. Crawford until the fall of 2016.  **Exh. 3**: O'Neill Decl. ¶ 3.  Plaintiff admits that: "Crawford was ordered to have no contact [with] Goldstein."  Compl. ¶ 308.  Plaintiff nonetheless complains that this no-contact order made it difficult to work.  *Id.* ¶¶ 310-311.  Although Plaintiff was not an employee of the University, and she interacted with Dr. Crawford in his capacity as a federal researcher at the VA, the University's Title IX office chose to investigate because it concerned allegations about one of its part-time employees.  **Exh. 3**: O'Neill Decl. ¶ 4.

**VI.    In October 2016, the University's Title IX Office Conducts an Investigation, Reviews Plaintiff's 4,572 Text Messages, Finds They Had a Social Relationship Outside Work, But Decides Not to Renew Its Contract with Dr. Crawford**

The University of Maryland Title IX office conducted a thorough investigation that include several interviews and review of documentation.  *Id.* ¶¶ 6-7; Compl. ¶ 331.  For the investigation, Plaintiff submitted 4,572 text messages that she and Dr. Crawford exchanged with each other. **Exh. 3**: O'Neill Decl.  6: **Exh. 3B**: E-mail on texts.

On June 5, 2017, the Title IX office issued an 11-page, single-spaced report. Compl. ¶ 353; **Exh. 3C**: Final Report.  The report found that Plaintiff and Dr. Crawford had a "professional and

personal relationship," and that both parties acknowledged that their encounters frequently involved alcohol" and that "their drinking was sometimes to excess." *Id.* at 2.

The report detailed how Plaintiff's allegations often did not match their text messages. Plaintiff pointed to Dr. Crawford "sending her photos of his hotel room in Costa Rica or buying her a gift while on his trip, and she describes this exchange as unwelcome harassment." *Id.* at 9. Yet, the report found their texts "indicates that she requested the photo, and the context makes it difficult to conclude that Dr. Crawford's messages or his gift were unwelcome." *Id.* It read:

| Aug 5, 2016  02:08 PM | **You would not believe this room** |
| Aug 5, 2016  02:35 PM | *Lucky you!  I'm swamped here : ( send a pic* |
| Aug 5, 2016  02:41 PM | **[photo]** |
| Aug 5, 2016  02:42 PM | **[photo]** |
| Aug 5, 2016  02:42 PM | **[photo]** |
| Aug 5, 2016  02:42 PM | *Whaaaaaat!!!* |
| Aug 5, 2016  02:42 PM | *That's awesome! Glad you're enjoying :)* |
| Aug 5, 2016  02:43 PM | **Be better if you were here** |
| Aug 5, 2016  02:44 PM | *[photo]* |
| Aug 5, 2016  02:45 PM | **Let me make it up to you wed** |
| Aug 5, 2016  02:46 PM | *deal* |
| Aug 5, 2016  02:46 PM | *Enjoy your mini paradise : )* |
| Aug 5, 2016  02:47 PM | **What do you want me to bring u?** |
| Aug 5, 2016  02:48 PM | *You pick you're good at that* |
| Aug 5, 2016  02:48 PM | **Oh yes** |

*Id.* at 9-10.  The report summarized other exchanges as follows:

> Throughout their communications, Ms. Goldstein would text Dr. Crawford in an affectionate and playful manner, including sending messages such as Happy Valentine's Day, telling him she missed him, at times encouraging his flirty texts, playfully chiding him for not texting back, sending photos of herself, celebrating personal milestones like the success of her GRE scores, telling him about her new hair color, and repeatedly denying that her sense of stress had anything to do with him.

*Id.* at 10.  Based on these tests, the report found that "the evidence suggests that their relationship voluntarily extended beyond that of strictly work colleagues, and that Dr. Crawford could reasonably conclude that his advances were not unwelcome." *Id.* at 10.  The report stated that it

10

"cannot conclude, by a preponderance of the evidence, that Ms. Goldstein was subjected to unwelcome sexual harassment by Dr. Crawford." *Id.* Nonetheless, the report concluded that Dr. Crawford had shown "poor judgment" in this personal relationship. *Id.* The University of Maryland informed Dr. Crawford that it would not renew his contract in 2017. **Exh. 3**: O'Neill Decl. ¶ 9.

## VII. Before the Title IX Report was Issued, Plaintiff Filed a Charge of Discrimination in February 2017 and Resigned in April 2017

In the interim, Plaintiff had voluntarily resigned her BREF position in April 2017. Compl. ¶ 356. Plaintiff blames this on rumors she was hearing at work. During her BREF work at the Baltimore VA, Plaintiff alleges the she heard "rumors about herself" and an unidentified co-worker commented "I hear you two were kissing." *Id.* ¶¶ 321-33. Plaintiff's Complaint does not disclose if these were BREF or VA employees. The Complaint does not plead any facts alleging that the University itself was deliberating instructing its employees to spread rumors.

The University issued a no-contact order against Dr. Crawford in October 2016. *Id.* ¶¶ 310-311 & 323. Plaintiff alleges she heard second-hand that Dr. Crawford told someone they had been "hooking up" (*id.* ¶ 344), and after resigning, she "received harassing calls from Crawford's wife" in July 2017. *Id.* ¶ 357.

Before the final report was issued, Plaintiff filed a Charge of Discrimination against the University of Maryland School of Medicine on February 3, 2017. **Exh. 1**: Charge. On March 24, 2017, Plaintiff filed a Charge of Discrimination "against BREF/VA Medical Center." Compl. ¶ 355. The EEOC declined to take action. On August 3, 2018, Plaintiff filed the present 55-page Complaint alleging three counts and four statutory claims within each count. [ECF 1].

## LEGAL STANDARD

Where subject matter jurisdiction is challenged under Rule 12(b)(1), the "burden of establishing subject matter jurisdiction rests with the plaintiff." *Demetres v. East West Constr., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015). Rule 12(b)(6) requires dismissal if the pleadings fail to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "Although the Court accepts the well-pled facts, it "need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012). Courts may also consider public records, and documents "attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Phillips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

Rule 56(a) mandates summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Parties may move for summary judgment "at any time...." Fed. R. Civ. P. 56(b).

## ARGUMENT

The Complaint pleads three counts with four statutory claims in each count under Title VI, Title VII, Title IX, and the Maryland Fair Employment Practices Act ("MFEPA"). Plaintiff cannot show that the University of Maryland was her "joint employer", which disposes of all of the claims.

Since these statutory claims have different exhaustion and substantive element additional grounds exist to dismiss each claim. For the Court's convenience, enclosed is a chart of Plaintiff's total twelve claims and the grounds to dismiss each of them:

12

| | Plaintiff's Complaint and the Legal Grounds to Dismiss Each Claim | | |
| --- | --- | --- | --- |
| **Claims** | **Count I: Hostile Work Environment** | **Count II: Retaliation** | **Count III: Constructive Discharge** |
| Title VI | Pleads no race discrimination | Pleads no race discrimination | Pleads no race discrimination |
| Title VII | Failed to exhaust admin. remedies | Barred by statute of limit  Pleads no adverse action | Fails to plead deliberate and intolerable conditions |
| Title IX | Fails to plead deliberate indifference | Fails to plead deliberate indifference  Pleads no adverse action | Fails to plead deliberate indifference  Fails to plead deliberate and intolerable conditions |
| MFEPA | Failed to exhaust admin. remedies | Barred by statute of limit  Pleads no adverse action | Fails to plead deliberate and intolerable conditions |

## I.    Plaintiff's Entire Case Against the University of Maryland Fails Because It Was *Not* Plaintiff's "Joint Employer" when She Worked for BREF on Federal Research with VA Patients at the Baltimore VA

The Court should grant summary judgment to the University of Maryland on all claims because Plaintiff cannot show that it was her "employer" or "joint employer." Plaintiff has the burden of pleading and proving this threshold requirement for all of her employment claims under Title VI, Title VII, Title IX, and MFEPA. *See Lissau v. So. Food Serv., Inc.*, 159 F.3d 177, 181 (4th Cir. 1998) ("Congress only intended employers to be liable for Title VII violations.").[7] The issue of whether Plaintiff is an employee of the University of Maryland is "a question of law" for

---

[7] *Accord Omeli v. Nat'l Council of Senior Citizens*, 12 F. App'x 304, 306 (6th Cir. 2001) (rejecting Title VI claims as plaintiff was "not an employee" of defendant); *Mayes v. Bd. of Educ. Prince George's Ctny.*, 2014 WL 3973930, at *5 (D. Md. 2014) ("[Plaintiff's] Title IX hostile work environment claim … may also only be brought, if at all, against an employer."); *Jackson v. Baltimore Police Dept.*, 2013 WL 1121412, at *10 (D. Md. Mar. 15, 2013) (dismissing MFEPA claim where defendants were not plaintiff's employer).

the Court to decide.  *See Farlow v. Wachovia Bank*, 259 F.3d 309, 313 (4th Cir. 2001) (holding as

a matter of law that attorney was not an employee of bank) (quotations omitted).

### A. The Court Should Recognize that Plaintiff Worked with VA-Appointed Doctors on Federal Research in Their Capacities as Federal VA Employees

In the leading decision of *Butler v. Drive Automotive Indus. of Am., Inc.*, 793 F.3d 404 (4th

Cir. 2015), the Fourth Circuit held that a plaintiff who was hired by a temporary employment

agency and assigned to work for a manufacturer on its factory floor could file a Title VII suit

against the manufacturer as a "joint employer" with the temp agency.  *See Butler*, 793 F.3d at 406.

The Fourth Circuit adopted the "hybrid" test which considers "both the common law of agency

and the economic realities" to decide if a defendant was a joint employer.  *Id*.

As explained above, BREF is a separate entity, created by statutory authority, to work with

the Baltimore VA.  It is able to and does hire its own employees, such as Plaintiff.  If BREF is a

"joint employer" of Plaintiff with anybody, it is with the VA, for which BREF managed federal

funds and supplied employees to work with federal researchers and VA patients on the floor of the

Baltimore VA Medical Center.[8]  *See* 38 U.S.C. § 7361, *et seq*.

The VA and BREF maintain control over the research and the funds.  As its website states:

"All research projects administered by the BREF must be approved by the VAMHCS Research

and Development (R&D) Committee" of the VA Maryland Health Care System.  **Exh. 2**: Lal Decl.

¶ 8; **Exh. 2C**:  BREF website.[9]  BREF retains the authority to "accept, administer, and spend

funds" and no funds may be spent "unless the activity is approved in accordance with procedures

---

[8] On information and belief, Plaintiff sued the University because she failed to timely contact an EEO counselor within 45 days and so any claim against the federal government is barred.  *See Guerrero v. Lynch*, 621 F. App'x 755, 755 (4th Cir. 2015) (citing CFR § 1614.105(a)(1)).

[9] *Available at*:  https://www.maryland.va.gov/research/bref/about_bref.asp.

prescribed" by the VA.  38 U.S.C. § 7364; **Exh. 2**: Lal Decl. ¶ 17.  As a federal court explained: "Notably, Congress did not grant individual investigators… the authority to manage research monies deposited into [the nonprofit's] accounts."  *Yu v. U.S. Dept. Veterans Affairs*, 2011 WL 2634095, at *14 (W.D. Penn. July 5, 2011).

The VA and BREF retain authority over personnel, including of investigators as "BREF investigators must hold a VA appointment."  **Exh. 2C**:  BREF website.  Pursuant to this requirement, both Dr. Lal and Dr. Crawford held separate VA appointments.  **Exh. 4B**: Lal MOU; **Exh. 4C**: Crawford MOU.  During their research at the Baltimore VA, Dr. Crawford and Dr. Lal were acting in their capacities as VA employees and were paid salaries from the federal payroll. Lal Decl. ¶¶ 6 & 10.

To obscure that fact, Plaintiff repeatedly conflates "the University" with Dr. Crawford, and repeatedly references his appointment with the University.  However, Plaintiff's theory ignores the well-established legal principle that an individual can work in two different capacities, and the work for one employer is not imputed to the other employer.

As the Supreme Court has explained: "Acts performed by the same person in two different capacities are generally treated as the transaction of ***two different legal personages***."  *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 543 n.6 (1986) (citations and quotations omitted).  The Fourth Circuit has likewise applied the "rule of differing capacities" for supervisors who have different legal capacities.  *See Brooks v. Arthur*, 626 F.3d 194, 203 (4th Cir. 2016) (holding employee's supervisors in their personal capacities were not in privity with state agency for retaliation claims); *Andrews v. Daw*, 201 F.3d 521, 525 (4th Cir. 2000) (recognizing state trooper had multiple capacities for purposes of constitutional claims).

In the analogous case of *Loewen v. Grand Rapids Medical Educ. Partners*, 2012 WL 1190145 (W.D. Mich. April 9, 2012), the court rejected a "joint employer" argument similar to

Plaintiff's theory in this case.  In *Loewen*, the plaintiff was a resident in the surgery program of the Grand Rapids Medical Education Partners' (GRMEP), a nonprofit educational corporation.  *See Loewen*, 2012 WL 1190145, at *1.  GRMEP's program director and instructors also held faculty appointments at Michigan State University.  *Id.* at *4.  Plaintiff brought Title VII hostile work environment claims not only against her employer GRMEP, but against Michigan State because its faculty members were "involved in the discriminatory acts" and "supervised the residents' day-to-day activities and evaluated their performance."  *Id.* at *5.  In granting summary judgment to Michigan State, the *Loewen* court explained that the "physicians who supervised and evaluated [plaintiff] … did so not because of their MSU faculty appointments, but because of their agreements with GRMEP."  *Id.*  The court further noted that Michigan State as an educational institution did not have "authority to hire and fire residents, promulgated work rules for residents, or did anything else that affected [plaintiff's] work as a resident." *Id.*

Likewise, here, the Court should recognize that University of Maryland faculty members were acting in their capacity as VA researchers when they worked with Plaintiff at the Baltimore VA Medical Center.

### B.  Plaintiff Cannot Show that the University of Maryland Was Her Joint Employer While She Worked on Federal Research at the Baltimore VA

For employment discrimination cases, the Fourth Circuit, as noted above, has adopted a hybrid test to assess whether a plaintiff is jointly employed by two entities.[10]  The factors are:

(1)   authority to hire and fire the individual;
(2)   day-to-day supervision of the individual, including employee discipline;
(3)   whether the putative employer furnishes the equipment used and the place of work;

---

[10] The Fourth Circuit has held that Fair Labor Standards Act case law is "not particularly transferrable to Title VII cases because the FLSA defines 'employee' more broadly than Title VII...."  *Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 143 (4th Cir. 2017).

(4)  possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes;

(5)  the length of time during which the individual has worked for the putative employer;

(6)  whether the putative employer provides the individual with formal or informal training;

(7)  whether the individual's duties are akin to a regular employee's duties;

(8)  whether the individual is assigned solely to the putative employer; and

(9)  whether the individual and putative employer intended to enter into an employment relationship.

*Butler v. Automotive Indus. of Am., Inc.*, 793 F.3d 404, 414 (4th Cir. 2015).  Plaintiff cannot show any of these nine factors against the University of Maryland as a State university.

## 1.  The University lacked authority to hire and fire Plaintiff

On the first factor, the University of Maryland lacked the authority over BREF to hire or fire Plaintiff.  Even in their capacities as VA employees, Dr. Crawford and Dr. Lal as principal investigators cannot simply hire or fire a BREF employee.  As BREF makes clear: **"Investigators cannot make job offers on behalf of BREF."**  Exh. 2C: BREF website, at ¶7 ("7. **Hiring Employees**") (bold in original); Lal Decl. ¶ 11.[11]  Instead, BREF's Executive Director must independently review and approve any requests for hires submitted by them.  *Id.*  Dr. Crawford and Dr. Lal certainly could not simply terminate any BREF employee.  **Exh. 2**: Lal Decl. ¶ 17.  Given their research projects had to be approved by the VAMHCS Research and Development Committee, they could not abruptly change their research teams on a whim without BREF or VA approval.  *Id.  See also Greene v. Harris Corp.*, 653 F. App'x 160, 164 (4th Cir. 2016) (affirming dismissal of joint employer theory though defendant had some control over which employees were assigned).

---

[11] *Available at*:  https://www.maryland.va.gov/ research/bref/ bref_guidelines.asp.

Most importantly, any recommendations Dr. Crawford or Dr. Lal could have made to BREF would have been in their capacities as VA employees—not University employees. *See Loewen*, 2012 WL 1190145, at *6 (holding Michigan State itself was not a "joint employer" as it had no authority to hire and fire residents where the doctors could only act "on behalf of GRMEP through their agreements"); *accord Press Ganey Associates, Inc. v. Dye*, 2014 WL 1116890, at *10 (N.D. Ind. Mar. 19, 2014) (rejecting "joint employer" status of defendant where the two individuals "conduct as directors of [the employer] are separate and distinct from their conduct as [the defendant's employees]" ).

The University of Maryland is further bound by State personnel statutes that are distinct from that of the federal government or a corporation. *See* MD. CODE ANN., EDUC. § 12-110, *et seq*. On these and federalism grounds, the Fifth Circuit has held that a State government subdivision cannot be judicially deemed a "joint employer." *Karagounis v. Univ. of Texas Health Science Center at San Antonio*, 168 F.3d 485, at *2 (5th Cir. 1999) (holding government subdivision rule prevented joint employer theory) (citing *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir. 1983)). *Accord Garrett-Woodberry v. Mississippi Bd. of Pharmacy*, 300 Fed.Appx. 289, 291 (5th Cir. 2008) (declining to aggregate employers as "the Board is a state agency and is thus a governmental subdivision"). These concerns are even more acute here as Plaintiff was working with federal employees at the Baltimore VA.[12] This factor weighs against imposing joint employer status on the University of Maryland.

---

[12] As an instrumentality of the State, the University of Maryland is entitled to Eleventh Amendment immunity from suit in federal court absent a clear waiver by the General Assembly. *See Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 239-40 (1985)).

**2.      The University did not exercise day-to-day supervision over Plaintiff and had no authority to discipline her**

The University of Maryland did not exercise day-to-day supervision over Plaintiff.  Dr. Lal and Dr. Crawford performed hundreds of surgeries each year, and could not possibly have supervised Plaintiff on a daily basis in her research work.  **Exh. 2**: Lal Decl. ¶ 16.

More importantly, Dr. Lal and Dr. Crawford were interacting with Plaintiff in their capacities as VA employees and federal researchers pursuant to their MOUs.  Thus, in the words of the *Loewen* Court the "physicians who supervised and evaluated [Plaintiff] did so not because of their [Maryland] faculty appointments, but because of their agreements with [the VA]." *Loewen*, 2012 WL 1190145, at *5.  The University of Maryland certainly had no authority to discipline Plaintiff as a BREF employee.

**3.      The University did not furnish the equipment or place of work**

Plaintiff's BREF office was located on federal property at the Baltimore VA.  Compl. ¶ 19. The VA provided Plaintiff with a "va.gov" e-mail address to use in her work.  **Exh. 2**:  Lal Decl. ¶ 13.  The equipment that Plaintiff utilized in her work was furnished by the VA, including the VA forms, records, peg boards, and computers.  *Id*.

Given the University did not furnish her equipment or place of work, this important factor weighs heavily against finding the University was her joint employer.  *See Butler*, 793 F.3d at 415 (holding third factor of where work takes place was valuable to test); *Wallace v. Bd. of Ed. of Calvert Cnty.*, 2017 WL 2361161, at *3 (D. Md. May 31, 2017) (holding third factor weighed against joint employer where a contractor provided and maintained employee's vehicle).

**4.      The University had no responsibility over Plaintiff's payroll, insurance or taxes**

The University had zero responsibility over Plaintiff's payroll, insurance or taxes.  Plaintiff did not even have a personnel file at the University (other than when her employment application

19

to the University was *rejected*).  **Exh. 5**: Dickerson Decl. ¶¶ 4-5.  Rather, BREF managed and administered all of these employer responsibilities.  Compl. ¶ 20.  This factor weighs against a joint employer theory.  *See, e.g., Berber v. Hutchison Tree Serv.*, 2018 WL 3869980, at *5 (E.D.N.C. Aug. 14, 2018) (observing plaintiffs did not allege employer "had any responsibility concerning his … payroll, worker's compensation, or insurance").

### 5.     Plaintiff only volunteered briefly at the University

Plaintiff was a BREF employee who worked virtually entirely on federal research at the Baltimore VA.  At some point in 2013, Plaintiff briefly volunteered to assist Dr. Michael Lilly for a few weeks on his multi-site study when she was applying for full-time employment with the University.  **Exh. 2**: Lal Decl. ¶ 18.  After Plaintiff's job application was denied by the University, her volunteer work for Dr. Lilly ended.  *Id.*  Given that Plaintiff worked overwhelmingly at the VA for BREF between 2013 and 2017, this short length of volunteer time does not indicate joint employer status.  *See Butler*, 793 F.3d at 414.

### 6.     Plaintiff was trained by BREF and VA employees

When Plaintiff joined BREF, she was primarily trained in patient intake by Dr. Moira Dux, a full-time VA employee.  **Exh. 2**: Lal Decl. ¶ 12.  Due to his busy surgical practices, Dr. Lal did not regularly train Plaintiff and generally met with her once a week.  *Id.* ¶ 16.

More significantly, Plaintiff would have been trained by researchers on federal salaries and acting in their capacities as VA employees.  *See Loewen*, 2012 WL 1190145, at *8 (rejecting joint employer status because the physicians who "train and supervise them" were being paid salaries by the medical nonprofit and not Michigan State).  This factor weighs against holding the University was her joint employer.

### 7.   Plaintiff's duties were not identical to regular duties at the University

Plaintiff was a research coordinator who performed patient intake with VA patients at the Baltimore VA.   **Exh. 2**: Lal Decl. ¶ 12.   Although the University also has research coordinators, they generally work with a different set of patients and at a different site.   This factor is neutral.

### 8.   Plaintiff's official assignment was solely to the Baltimore VA

BREF assigned Plaintiff to the Baltimore VA, not the University.   At most, Plaintiff volunteered briefly on Dr. Lilly's multi-site study at the University for a few weeks.   This factor weighs against joint employer status.

### 9.   There was no intent to enter an employment relationship

Lastly, the University of Maryland certainly had no intent to enter into an employment relationship with Plaintiff.   To the contrary, the University had rejected Plaintiff's job application in 2014.   **Exh. 5**: Dickerson Decl. ¶ 5.   Plaintiff could not have been a University employee.

In sum, the *Butler* factors weigh overwhelmingly against finding the University was a joint employer in this case.   Because the University was not Plaintiff's employer, the Court should grant summary judgment to the University on the employment discrimination claims in all three counts.

## II.   The Court Should Dismiss the Title VI Race Discrimination Claim in Each Count

For the University's motion to dismiss, the Court should initially dismiss the Title VI race discrimination claims from all three counts.   The plain language of the statute reads:

> No person in the United States shall, on the ground of ***race, color, or national origin***, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d (emphasis added).

By its terms, Title VI does ***not*** extend to discrimination based on sex or gender.   *See Gebser v. Lago Vista Independ. School Dist.*, 524 U.S. 274, 286 (1998) ("Title VI of the Civil Rights Act

of 1964 … is parallel to Title IX except that it prohibits race discrimination, not sex discrimination….") (citation omitted); *McCrea v. Johns Hopkins Univ.*, 2016 WL 6166999, at *6 (D. Md. Oct. 24, 2016) ("Title VI addresses discrimination on the basis of race, color, or national origin" whereas "Title IX addresses discrimination on the basis of sex").

Plaintiff's pleadings are bereft of any allegations she was discriminated against on the basis of race. The Court should dismiss her Title VI claims from all three counts.

### III.   The Court Should Dismiss the Count I Hostile Work Environment Claims For Lack of Subject Matter Jurisdiction and on Deliberate Indifference

Plaintiff's Count I claims for hostile work environment fail on jurisdictional and substantive grounds. The Court should dismiss each of the Title VII, Title IX, and MFEPA claims.

#### A.   Plaintiff Failed to Exhaust Administrative Remedies Where Her Charge of Discrimination Referenced Different Time Frames and Actors than She Alleged in the Complaint

Pursuant to Rule 12(b)(1), the Court lacks subject matter jurisdiction over the Title VII and MFEPA hostile work environment claims due to the failure to exhaust administrative remedies. Before filing suit on the Title VII and MFEPA claims, Plaintiff was required to have exhausted the administrative process starting with the Charge of Discrimination. 42 U.S.C. § 2000e-5(f)(1); MD. CODE ANN., STATE GOV'T § 20-1004(c)(1); *id.*, 20-1013(a).

"The EEOC charge defines the scope of the Plaintiff's right to institute a civil suit." *Bryant v. Bell Atlantic Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002). Allowing Plaintiff's Complaint "to encompass allegations outside the ambit of the predicate EEOC charge circumvents the EEOC's investigatory and conciliatory role." *Manning v. Foodarama, Inc.*, 195 F. Supp. 2d 741, 743-744 (D. Md. 2002) (Blake, J.) (quoting *Riley v. Technical & Mgmt. Svcs. Corp., Inc.*, 872 F. Supp. 1454, 1459 (D. Md. 1995) (finding sexual harassment claims were outside scope of charge)).

In any subsequent lawsuit "a federal court may only consider those allegations included in the EEOC Charge." *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 407 (4th Cir. 2013) (citations omitted).  Where, as here, Plaintiff's "administrative charges reference ***different time frames***, ***actors***, and ***discriminatory conduct*** than the central factual allegations in his formal suit, there is no subject matter jurisdiction." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 506 (4th Cir. 2005) (reversing jury verdict on Title VII hostile work environment claim based on failure to exhaust administrative remedies) (emphasis added).

Here, Plaintiff's Charge set the dates of discrimination as:  "Earliest **05-03-2016**" to "Latest **01-31-2017**."  **Exh. 1:**  Charge (bold in original).  Plaintiff's Charge stated these particulars:

> I began my employment with the above referenced employer on January 1, 2012, as a Research Intern.  ***Beginning in April, 2016***, ***Dr. Crawford***, supervisor, subjected me to unwelcome physical sexual advances and comments, placing his hand on my legs and repeatedly demands I join him for a drink after work hours. ***In May, 2016***, ***Dr. Crawford*** started sending me romantic text messages, asking me to send him my personal photographs, buying me jewelry and sending me photos from his family vacations.  I notified senior supervisor ***Dr. Shabab Tousavadkobi***, he stated I should try to continue to say no and avoiding running to Dr. Crawford. Dr. Tousavadkobi did nothing and failed to notify Respondent human resources. Dr. Crawford and ***Dr. Brajesh Lal***, supervisor, began retaliating against me, Dr.Crawford threatened to remove me from the division and Dr. Lal, threatened to cut funding for the research work I was assigned, so that I could lose my employment.

*Id.* (emphasis added).  Plaintiff told the administrative agencies that the time frame was the nine months from April/May 2016 to January 2017, and the harassing was solely by Dr. Crawford.

However, Plaintiff's lawsuit greatly expands the time frame back ***three years*** to 2013, and alleges new and different actors.  For example, Plaintiff now alleges that as far back as 2013, Dr. Sarkar (who is not named in the Charge) made "his own improper remarks" and "mimicked fellatio." Compl. ¶¶ 32-33.  Plaintiff also asserts sexual harassment by Dr. Lijo Panghat, who is also not named in the Charge, starting in October 2015.  *Id.* ¶ 131.  Contradicting the Charge,

Plaintiff now claims Dr. Crawford started harassing her "around April 2014" (*id.* ¶ 49)—*two years* before the Charge's earliest date of discrimination.  **Exh. 1**:  Charge.

Courts dismiss hostile work environment claims where, as here, the Complaint has shifted the time frames of the harassment in the Charge, *see Smith v. Bank of Stanly*, 2011 WL 627625, at *19 (M.D.N.C. Feb. 11, 2011) (dismissing where complaint alleged hostile work environment that predated earliest time in charge of discrimination), and raises new actors and harassment. *See Finlay v. Fortis Inst.-Towson*, 2015 WL 4920905, at *5 (D. Md. Oct. 8, 2015) (dismissing claim where different supervisor was "nowhere mentioned in the EEOC charge"); *Holland v. Compass Group, USA, Inc*., 2015 WL 4208623, at *3 (W.D.N.C. July 10, 2015) ("The EEOC Charge contains no mention of Aaron or West, or the two comments described in the Complaint.").  Given Plaintiff had counsel when she filed (Compl. ¶ 328), there is no excuse for changing time frames and actors.  *See Tillberry v. Kent Island Yacht Club, Inc.*, 2010 WL 2292499, at *5 (D. Md. June 4, 2010) (dismissing Title VII claims where plaintiff "who was represented by counsel at the time, signed the EEOC charge under penalty of perjury despite its apparent inaccuracy") (Blake, J.), *aff'd Tillbery v. Kent Island Yacht Club, Inc.*, 461 F. App'x 288, 291 (4th Cir. 2012).

Therefore, the Court should dismiss the Title VII and MFEPA claims from Count I.

**B.      Plaintiff Cannot Satisfy Title IX's High Bar of Actual Knowledge and Deliberate Indifference, Where the University of Maryland's Title IX Office Promptly Investigated Plaintiff's Complaints**

Although Title IX does not require administrative exhaustion, its substantive elements are much higher than with Title VII and MFEPA.  In *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998), the Supreme Court expressly rejected the use of "principles of *respondeat superior* or constructive notice" to impose Title IX liability on a funding recipient for the sexual

harassment of one of its employees.  *See Gebser*, 524 U.S. at 237.  In *Gebser*, the Court affirmed summary judgment for the defendant school on a Title IX sexual harassment claim, even though the school principal had heard complaints about inappropriate comments being made by a teacher who had sexually harassed and had intercourse with a student.  *See Gebser*, 524 U.S. at 291.

The Court held that a Plaintiff must show that "an official who … has authority to address the alleged discrimination and to institute corrective measures … has ***actual knowledge*** of discrimination" and moreover the defendant's "response must amount to ***deliberate indifference*** to discrimination."  *Id.* at 290.  In other words, the University can only be held liable under Title IX for "***its own official decision***."  *Id.* at 291.  *Accord Davis v. Monroe County Bd. of Educ.*, 525 U.S. 629, 642 (1999) (stating Title IX liability arises from "an official decision" (quoting *Gebser*, 524 U.S. at 290)) (emphasis added).

The Supreme Court requires a Title IX Plaintiff prove deliberate indifference because "[u]nder a lower standard, there would be a risk that the recipient would be liable in damages not for its own official decision but instead for its employee's independent actions."  *Gebser*, 524 U.S. at 290-91.  "In an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law."  *Davis*, 526 U.S. at 649.

Deliberate indifference is a high standard, and "a showing of mere negligence will not meet it."  *Baynard v. Malone*, 268 F.3d 228, 236 (4th Cir. 2001) (citation omitted); *Butters v. James Madison University*, 208 F. Supp. 3d 745, 756 (W.D. Va. 2016) ("Even in cases where universities have done seemingly little in response to a complaint of sexual assault, courts have held there was no deliberate indifference." (citing cases)).  Plaintiff must plead facts to show that the school's official response was "clearly unreasonable in light of the known circumstances."  *Davis*, 526 U.S. at 648.  This standard applies "even if the harm is not averted."  *Butters*, 208 F. Supp. 3d at 756.

Here, there are no allegations that Plaintiff complained to the University of Maryland's Title IX office or Dean's Office—the officials with the power to institute corrective measures at the University—until late 2016. Once notified, the Title IX office voluntarily decided to conduct a Title IX investigation, even though Plaintiff was not its employee, and their interactions arose out of their work at the Baltimore VA Medical Center. The Title IX office conducted a thorough investigation, reviewed all documentation supplied by Plaintiff, and issued a single-spaced, 11-page Title IX report. **Exh. 3C**: Report. Based on Plaintiff's own text messages, the Title IX office reasonably found it "cannot conclude, by a preponderance of the evidence, that Ms. Goldstein was subjected to unwelcome sexual harassment by Dr. Crawford." *Id.* The University nonetheless informed Dr. Crawford it would not renew his contract in 2017. **Exh. 3**: O'Neill Decl. ¶ 9.

In sum, in response to Plaintiff's allegations of sexual harassment against Dr. Panghat and Dr. Crawford, the University terminated the fellowship of Dr. Panghat, and choose not to renew the contract of Dr. Crawford. Far from "deliberate indifference," the University's Title IX Office acted prudently under the circumstances and its responses "were not clearly unreasonable." *Doe v. Bd. of Educ. of Prince George's Cnty.*, 605 F. App'x 159, 167 (4th Cir. 2015) (affirming summary judgment to defendant school board on Title IX sexual harassment claim); *Doe v. Bd. of Educ.*, 982 F. Supp. 2d 641, 658 (D. Md. 2013) (holding school's responses were not "clearly unreasonable" to show Title IX liability for sexual harassment).

Although Plaintiff criticizes details of the University's investigation, and is still unsatisfied with the outcome, that is ***not*** sufficient to show deliberate indifference by the University. *See Doe*, 605 F. App'x at 158 (rejecting theory school should have "more thoroughly investigated [plaintiff's] allegations" as this would "substitute a negligence standard for the deliberate indifference standard"); *Bracey v. Buchanan*, 55 F. Supp. 2d 416, 420 (E.D. Va. 1999) ("That the Plaintiff is dissatisfied with the outcome of the investigation has no bearing on [a] Title IX claim,

absent an allegation that [defendant] showed a deliberate indifference."). *See also Doe v. Univ. of Notre Dame*, 2018 WL 2184392, at *2 (N.D. Ind. May 11, 2018) (dismissing Title IX claim even though Plaintiff was "clearly dissatisfied with the outcome" of the investigation).

## IV.     Plaintiff's Count II Does *Not* Plead a Cognizable Claim of Retaliation

Plaintiff's Count II claims for retaliation are time-barred and fail on the elements.  For the retaliation claims, Plaintiff has the burden of pleading and proving that: "(1) [she] engaged in a ***protected activity***; (2) [Defendant] took an ***adverse employment action*** against [her]; and (3) a ***causal connection*** existed between the protected activity and the asserted adverse action." *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 650 (4th Cir. 2002) (emphasis added).

Here, Plaintiff is asserting *quid pro quo* sexual harassment claims under the label of "retaliation."  Plaintiff's claims are further time-barred or fail to plead essential elements.

### A.     Plaintiff Has *Not* Alleged "Retaliation" for Protected Activity, But *Quid Pro Quo* Claims Without Tangible Adverse Employment Actions

For Count II, fully half of Plaintiff's factual allegations of "retaliation" are really *quid pro quo* claims of sexual harassment with no causal connection to protected activity.  Compl. ¶¶ 391-396. The Complaint alleges "Crawford demanded that Goldstein grant him a date" (*id*. ¶ 391), and "Crawford berated Goldstein in the presence of their superiors, after she had persisted in rejecting his advances." *Id.* 396.  The Complaint is describing alleged reactions to declined *quid pro quo* demands.  Elsewhere the pleadings use the phrase "*quid pro quo* exchange…."  (Compl. ¶ 59).

Retaliation claims "refer to retaliation caused by a ***protected activity***, not 'retaliation' triggered by anger over a person declining sexual advances." *Longo v. Purdue Pharma, L.P.*, 2014 WL 2800817, at *2 (D.N.J. June 19, 2014) (emphasis in original).  So while "*quid pro quo* claims involve an element of retaliation, it is not retaliation in response to an employee's protected activity (the form of retaliation addressed in 2000e-3(a)) but retaliation in response to an employee's

refusal to accede to a supervisor's sexual advances." *Richardson-Holness v. Alexander*, 196 F. Supp. 3d 364, 375 n.5 (E.D.N.Y. 2016).

"Courts have thus treated *quid pro quo* claims as a type of status-based discrimination falling under § 2000e-2(a), and not retaliation cognizable under 2000e-3(a)." *Richardson-Holness*, 196 F. Supp. 3d at 375 n.5. *See also Lack v. Wal-Mart Stores, Inc.*, 240 F.3d 255, 259 n.5 (4th Cir. 2001) (noting "the theory describes quid pro quo harassment, rather than a 'true' retaliation claim…."). Likewise, here, Plaintiff cannot bring *quid pro quo* claims as "retaliation." This is legally significant because *quid pro quo* claims generally require a "tangible employment action" such as "discharge, demotion, or undesirable reassignment" to impute liability to the defendant employer. *See Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 267 (4th Cir. 2001). The prolix pleadings bury the fact that the University of Maryland did not (and could not) take a tangible employment action against Plaintiff at BREF. Thus, these claims fail.

**B.      Count II's Retaliation Claims under Title VII and MFEPA are Time-Barred and Fail to Plead Essential Elements**

The only factual allegations which even suggest retaliation claims are time-barred under Title VII and MFEPA. The Title VII retaliation claim is governed by a 300-day statute of limitations from the time the Charge of Discrimination was filed on February 3, 2017. **Exh. 1**: Charge; *Williams v. Giant Food, Inc.*, 370 F.3d 423, 429 (4th Cir. 2004) (holding Title VII claim brought in Maryland must be filed within 300 days).[13] Therefore, the Title VII retaliation claims can only be based on acts that occurred on or after ***April 9, 2016***.

___

[13] Retaliation claims are discrete acts "not subject to the continuing violations exception." *Phillips v. Univ. of Md., Baltimore Cty.*, 2018 WL 1474178, at *7 n.8 (D. Md. Mar. 26, 2018) (Blake, J.) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002).

The MFEPA retaliation claims is governed by a two- (2) year statute of limitations, which is not tolled by the administrative proceedings, but rather is counted two years back from when this lawsuit was filed on August 2, 2018. *See, e.g., Westmoreland v. Prince George's Cnty.*, 2015 WL 996752, at *13 (D. Md. Mar. 4, 2015) ("There is no provision in the MFEPA to toll the two-year statute of limitations while the administrative process unfolds."). Therefore, the MFEPA retaliation claims can only be based on acts that occurred on or after ***August 2, 2016***.

Here, Plaintiff's claims of retaliation in November 2015 for protesting Dr. Crawford's conduct at the Brewer's Art occurred several months before the limitations bar of April 2016. Compl. ¶¶ 132-163; *id.* 392-395. Plaintiff's claim that "Defendant admitted anger at Goldstein for protesting Panghat's sexual harassment" shortly before Panghat's termination in January 2016 is time-barred as well. *Id.* ¶¶ 174-175 & 395. The Court should dismiss these Title VII and MFEPA retaliation claims under the statute of limitations. *See Kwarteng v. Morgan State Univ.*, 128 F. App'x 301, 303 (4th Cir. 2005) (affirming dismissal of Title VII retaliation claims as time-barred); *McCleary-Evans v. Md. Dept. of Transp.*, 2015 WL 1285325, at *23 (D. Md. Mar. 20, 2015) (holding MFEPA claim was barred by limitations) *aff'd* 631 F. Appx. 178 (4th Cir. 2016).

Such allegations also would not rise to an adverse action. Angry comments are not enough as Title VII "does not set forth a general civility code for the American workplace." *Burlington No. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (holding sporadic "abusive language" is not a materially adverse action for Title VII retaliation claim); *Daniel Morgan Graduate School of Nat'l Sec. v. Mills*, 2018 WL 1915928, at *5 (E.D. Va. April 23, 2018) (holding fact university president "became angry" did not rise to adverse action); *Cepada v. Bd. of Educ. of Baltimore Cnty.*, 947 F. Supp. 2d 772, 788 n.51 (D. Md. 2013) (D. Md. Dec. 18, 2014) (holding supervisor "yelling at" supervisee was not adverse action for Title VII claim).

The Court should dismiss the Title VII and MFEPA retaliation claims from Count II.

29

### C.      The Title IX Retaliation Claims Do *Not* Plead Facts to Show Actual Knowledge and Deliberate Indifference by the University of Maryland

The retaliation claim under Title IX fails to plead facts necessary to impute liability to the University of Maryland.  The Complaint does not allege that the University itself ordered anyone to retaliate against Plaintiff.  Rather, Plaintiff alleges "retaliation" by Dr. Crawford.

Not only has Plaintiff failed to plead retaliation, there is no basis to impute retaliation liability to the University as an institution.  *See Davis,* 525 U.S. at 642 (citing *Gebser*, 524 U.S. at 290) (emphasis added).  Plaintiff's and Dr. Crawford's interactions arose out their work on federal research at the Baltimore VA.  There are no allegations that the University of Maryland's Title VII office even knew about the Brewer's Art night or Dr. Crawford's alleged reactions to it until more than a year later.  When Plaintiff did submit a Title IX complaint, rather than retaliating, the Title IX office conducted a thorough investigation into the accusations.  *See supra* Point III.C.

The University of Maryland cannot be held liable where its response was not clearly unreasonable.  *See M.D. by and through Deweese v. Bowling Green Indep. Sch. Dist.*, 709 Fed. Appx. 775, 779 (6th Cir. Oct. 6, 2017) (holding schools' response to alleged retaliation by a coach was not "clearly unreasonable in light of the known circumstances"); *Power v. Gilbert Public Schools*, 2009 WL 5185297, at *5 (D. Ariz. Dec. 22, 2009) (rejecting Title IX retaliation claim where school "diligently investigated the complaints").

### V.      Plaintiff's Count III for Constructive Discharge Does *Not* Plead Facts to Show Deliberateness and Intolerability of Conditions at the University of Maryland

Plaintiff's Count III asserts a "constructive discharge" by the University of Maryland based on her resignation from her BREF position in April 2017.  Compl. ¶¶ 356, 405-409.  An employee is considered constructively discharged only "if an employer deliberately makes the working conditions intolerable in an effort to induce the employee to quit." *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 186-87 (4th Cir. 2004).  "Because the claim of constructive discharge

is so open to abuse by those who leave employment of their own accord, this Circuit has insisted that it be carefully cabined." *Honor*, 383 F.3d at 187.

Plaintiff must allege facts to show: "(1) the deliberateness of [defendant's] actions ... and (2) the objective intolerability of the working conditions." *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 425 (4th Cir. 2014). Plaintiff's factual allegations for this claim, which focus on rumors and comments by co-workers, failed to show either element.

## A. The Court Lacks Subject Matter Jurisdiction over the Constructive Discharge Claim

As a threshold matter, the Court should dismiss the Title VII and MFEPA constructive discharge claims for failure to exhaust administrative remedies. Plaintiff's Charge of Discrimination, filed on February 3, 2017, does not allege intolerability of conditions due to rumors by co-workers. **Exh. 1**: Charge. Plaintiff left her BREF position in April 2017. Compl. ¶ 356. Yet, Plaintiff's counsel never filed a supplemental Charge of constructive discharge.

The Court thus lacks subject matter jurisdiction over and should dismiss the constructive discharge claims under Title VII and MFEPA. *See Spencer v. Ashcroft*, 147 F. App'x 373, 375 (4th Cir. 2005) (affirming dismissal of claim for constructive discharge as discrete act for failure to exhaust administrative remedies); *Malghan v. Evans*, 118 F. App'x 731, 734 (4th Cir. 2004) (holding constructive discharge is a discrete discriminatory act that requires administrative exhaustion); *Knotts v. Univ. of No. Carolina at Charlotte*, 2011 WL 650943, at *5 (W.D.N.C. Feb. 10 2011) (granting Rule 12(b)(1) motion to dismiss as "Plaintiff did not exhaust her administrative remedies as to the retaliatory constructive discharge claim").

## B. Plaintiff Has *Not* Pled Deliberateness by the University of Maryland

On the first prong of deliberateness, there are no factual allegations to show the University's engaged in a "calculated effort to pressure [Plaintiff] into resignation through the

31

imposition of unreasonably harsh conditions, in excess of those faced by [her] co-workers." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 378 (4th Cir. 2004). Here, the University issued a no-contact order against Dr. Crawford. Compl. ¶¶ 310-311 & 323.

Plaintiff complains that she heard "rumors about herself" and an unidentified co-worker commented "I hear you two were kissing." *Id.* ¶¶ 321-333. Plaintiff does not disclose if these comments were made by University employees, as opposed to her own BREF co-workers. To the contrary, Plaintiff even complains she "received harassing calls from Crawford's wife…." *Id.* ¶ 357. There is no plausible allegation the University engineered any of it. *See, e.g.*, *Crockett v. SRA Int'l*, 943 F. Supp. 2d 565, 577 (D. Md. 2013) (dismissing constructive discharge claim where the allegations "fail to indicate that Defendant deliberately created the intolerable conditions").

The University cannot control what BREF or VA employees talk about at their workplace. The University is not aware of a single case where a "joint employer" was held responsible for a constructive discharge due to conditions at the actual employer's site. Neither should this Court.

**C.   Plaintiff Has *Not* Pled an Objective Intolerability of Conditions**

On the second prong of intolerability, this is "a high standard, and even truly awful working conditions may not rise to the level of constructive discharge." *Tawwaab v. Va. Linen Serv., Inc.*, 729 F. Supp. 2d 757, 784 (D. Md. 2010). As the Fourth Circuit has explained: "The 'intolerability' standard governing constructive discharge claims is ***more stringent than the 'severe and pervasive' standard for hostile work environment claims***." *Nnadozie v. Genesis HealthCare Corp.*, 730 F. App'x 151, 162 (4th Cir. 2018) (citing *Amirmokri v. Balt. Gas & Elec. Co.*, 60 F.3d 1126, 1133 (4th Cir. 1995) (explaining hostile work environment claims require "less severe" conditions vis-a-vis the conditions required for constructive discharge claims)) (emphasis added).

Plaintiff's explanation about what caused her resignation in April 2017 do not come close to this standard. Here, Plaintiff alleges that after she filed her Title IX complaint, she was "hearing

32

new rumors" and noticed that "staff were very cold towards her…." Compl. ¶¶ 341 & 347. However, the Fourth Circuit has held that a "feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Honor*, 393 F.3d at 187. This Court has specifically found that being ostracized by co-workers or hearing false rumors does not rise to the "level of true intolerability." *Overstreet v. Calvert Cnty. Health Dept.*, 187 F. Supp. 2d 567, 574 (D. Md. 2002) (Blake, J.) (citing *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 273 (4th Cir. 2001) (ostracism by co-workers fails to make work place intolerable)). Plaintiff also claims she heard that Dr. Crawford "was talking about hiring private investigator [sic]…." (Compl. ¶ 340). Putting aside there are no allegations the University supported any of this, this would not rise to intolerability. *See also Munday v. Waste Mgmt., Inc.*, 126 F.3d 239, 243 (4th Cir. 1997) ("In no case in this circuit have we found an adverse employment action to encompass a situation where the employer has instructed employees to ignore and spy on an employee who engaged in a protected activity.").

In short, the pleadings do not meet the high bars of deliberateness or intolerability. The Court should dismiss the Count III constructive discharge claims in their entirety.

## CONCLUSION

For the reasons stated above, the Court should grant Defendants University of Maryland School of Medicine and University of Maryland, Baltimore's motion and dismiss or, in the alternative, for summary judgment, and dismiss them from this case.

Dated:   November 9, 2018
         Baltimore, Maryland

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland


*/s/ C. Alexander Hortis*
C. Alexander Hortis (Fed. Bar No. 28522)
Assistant Attorney General
Educational Affairs Division
200 St. Paul Place, 17th Floor
Baltimore, Maryland 21202-2021
Phone: (410) 576-6320
Email: ahortis@oag.state.md.us

*Attorneys for Defendants University of Maryland*
*School of Medicine and University of Maryland,*
*Baltimore*