**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **CARLY GOLDSTEIN** | * | |
| | * | |
| v. | * | **Civil Action No. CCB-18-2376** |
| | * | |
| **THE UNIVERSITY OF MARYLAND,** *et al.* | * | |

**MEMORANDUM**

The plaintiff, Carly Goldstein, worked with employees of the defendants, the University of Maryland and its School of Medicine (collectively, the "University"), during which time she claims she was subjected to repeated sexual harassment by the University's Dr. Robert Crawford. On August 2, 2018, she filed a complaint in this court against the University and Baltimore Research and Education Foundation ("BREF").[1] The University has filed a motion to dismiss for failure to state a claim, or, alternatively, a motion for summary judgment, which has been fully briefed. The court will treat the motion as a motion to dismiss and will deny it in part and grant it in part for the following reasons.

**FACTUAL AND PROCEDURAL HISTORY**

The parties have a lengthy history, only the relevant portions of which will be recited here. Because this involves the University's motion to dismiss, and because there has been no discovery, the court will assume the factual allegations in the complaint are true.

In 2012, Ms. Goldstein began working at the University's medical center as a research intern, and later became a paid intern who conducted academic research primarily at the Baltimore VA Medical Center but also on University property. Am. Compl., ECF 22 ¶¶ 17–18. In 2014, Dr. Brajesh Lal, who held dual appointments as the University's Director of Clinical Research for the

---

[1] Ms. Goldstein filed an amended complaint on November 30, 2018. On March 22, 2019, she dismissed her claims against BREF.

Vascular Division and Chief of Vascular Surgery at the Baltimore VA Medical Center, asked Ms. Goldstein to apply for a University research assistant position that was to be supervised by Melita Braganza, a University employee assigned to the VA. *Id.* at ¶¶ 13, 21–22, 30, 59. Ms. Goldstein applied, but was not hired, and the vacancy was cancelled. *Id.* at ¶ 30; ECF 30-5. Instead, Dr. Lal and Ms. Braganza told Ms. Goldstein that they had money in the University's BREF account, so they were going to hire Ms. Goldstein through BREF. ECF 22 ¶ 31. Ms. Goldstein applied to BREF, which hired her via an offer letter signed by Dr. Lal. *Id.* at ¶¶ 32–34.

In her BREF position, Ms. Goldstein coordinated research-related activities for the University, and worked under the supervision of Melita Braganza, Dr. Lal, and Dr. Robert Crawford, a vascular surgeon who held appointments at both the university and the VA. *Id.* at ¶¶ 14, 39, 41–43, 59. She was also assigned projects by Dr. Shahab Toursavadkohi, another vascular surgeon with dual University and VA appointments. *Id.* at ¶ 66. According to Ms. Goldstein, her responsibilities were identical to the responsibilities she would have had if the University had hired her, and her work focused on University projects. *Id.* at ¶¶ 38, 43. Specifically, she spent approximately 50% of her time working on the University's NTA3CT study, 10% of her time dedicated to a separate University study, another 10% on Dr. Toursavadkohi's studies startup work, 5% on University administrative work, and 25% on VA studies. *Id.* at ¶¶ 43, 45–46. Ms. Goldstein conducted the vast majority of her work at the VA using VA facilities. *Id.* at ¶¶ 4, 67. At one point, Dr. Rajabrata Sarkar, the Chief of Vascular Surgery for the University of Maryland Medical Center, [3] tasked Ms. Goldstein with recruiting another research assistant to be paid by the University to do work similar to Ms. Goldstein's for similar pay, and whom Ms. Goldstein trained. *Id.* at ¶¶ 66, 84–87.

---

[3] Dr. Sarkar did not hold a VA appointment. *Id.* at ¶ 12.

Ms. Goldstein alleges that, from 2014 to at least October 2016, she was sexually harassed by Dr. Crawford. *Id.* at ¶¶ 150, 493. Dr. Crawford continuously made sexual comments to Ms. Goldstein both during and outside of work, and repeatedly texted her, including one text message exchange where he said that he was going to kidnap her, adopt her, marry her, clone her, and eat her. *E.g. id.* at ¶¶ 150, 169–70, 225–27, 230–31, 328–29. Ms. Goldstein alleges that Dr. Crawford engaged in *quid pro quo* exchanges of his cooperation in completing work tasks for Ms. Goldstein with Ms. Goldstein's agreement to socialize with him, *e.g. id.* at ¶¶ 160, 212, 305–07, despite Ms. Goldstein stating she only wanted to be professional friends, *id.* at ¶ 165. Additionally, Ms. Goldstein claims on several occasions Dr. Crawford touched her against her will. For example, on July 24, 2015, Dr. Crawford went to Ms. Goldstein's brother's house, where he tried to kiss her and reached his hand down her shirt, leading Ms. Goldstein to push him away and telling him to leave. *Id.* at ¶¶ 218–23. Later, in November 2015, at The Brewer's Art, a restaurant in Baltimore, Dr. Crawford put his arm around Ms. Goldstein, touched her legs and thigh, and kissed her against her will despite Ms. Goldstein repeatedly telling him to stop. *Id.* at ¶¶ 234, 236. Once Ms. Goldstein began to cry and beg for Dr. Crawford to stop, he became angry, telling her to relax, grow up, and that she was acting like a child, and complaining that Ms. Goldstein had not turned down her previous boyfriend. *Id.* at ¶¶ 237–40. After Ms. Goldstein would refuse his advances, she alleges Dr. Crawford would use his role to prevent Ms. Goldstein from completing her work, such as by failing to order CT scans and blood work Ms. Goldstein needed for her studies. *E.g. id.* at ¶¶ 293–94, 407–08. Ms. Goldstein claims this constituted a tangible adverse employment action. *Id.* at ¶ 408.

Ms. Goldstein alleges that she complained about Dr. Crawford's harassment multiple times to Dr. Toursavadkohi, as well as Dr. Sarkar, who supervised Dr. Crawford. *Id.* at ¶¶ 12, 16. For

example, in summer 2015, Ms. Goldstein told Dr. Toursavadkohi that Dr. Crawford was "ridiculous and won't leave me alone." *Id.* ¶ 203. In November 2015, after the Brewer's Art incident described above, a fellow vascular surgeon informed Dr. Toursavadkohi of the incident. *Id.* at ¶ 244. Dr. Toursavadkohi later met with Ms. Goldstein, where they discussed the Brewer's Art incident and Dr. Crawford's harassing behavior in the workplace; Dr. Toursavadkohi informed Ms. Goldstein that Dr. Crawford requested that she be removed from the division. *Id.* at ¶¶ 247–48, 251–54. Dr. Toursavadkohi agreed that the request to remove Ms. Goldstein from the division was retaliation for Ms. Goldstein's rejecting Dr. Crawford's sexual advances. *Id.* at ¶ 254. Dr. Toursavadkohi said that he would "handle it" and he would "take care of Crawford, he will not do this again." *Id.* at ¶ 256. At some point after, Dr. Crawford was ordered to apologize to Ms. Goldstein, but instead scolded her for overreacting and complaining to Dr. Toursavadkohi, and demanded she rescind her sexual harassment complaints against him. *Id.* at ¶¶ 260–65.

Ms. Goldstein also complained to Dr. Sarkar about Dr. Crawford's treatment. On January 19, 2016, Ms. Goldstein ran into Dr. Sarkar at an Au Bon Pain restaurant and told him about the harassment. *Id.* at ¶ 295. In or around March 2016, Ms. Goldstein again raised concerns about Dr. Crawford's treatment of her with Dr. Sarkar. *Id.* at ¶ 304. Dr. Sarkar suggested that Ms. Goldstein copy him on any emails from the study's sponsor if Dr. Crawford did not complete his duties. *Id.* at ¶ 305. However, when she did so, Dr. Crawford called Ms. Goldstein and screamed at her for copying Dr. Sarkar on an email. *Id.* at ¶ 313. Ms. Goldstein also brought up Dr. Crawford's treatment of her to Dr. Sarkar on or about June 7, 2016, when she was asked to weigh in on Dr. Crawford's potential promotion. *Id.* at ¶¶ 334–35. Ms. Goldstein claims that, at some point in March 2016, Dr. Sarkar said to an unidentified person that Dr. Crawford "did something terrible to that girl in research and it's damaged his relationship with Tour[savadkohi].

4

Tour[savadkohi] is mad at him." *Id.* at ¶ 311. Neither Dr. Sarkar nor Dr. Toursavadkohi reported any of these incidents to the Title IX coordinator. *E.g. id.* at ¶¶ 353, 397.

Sometime in August 2016, Dr. Sarkar met with Ms. Goldstein and informed her that funding for Dr. Lal was ending, and that the University therefore might reduce her to part-time status. *Id.* at ¶ 409. Ms. Goldstein did not believe Dr. Sarkar's claim regarding the funding, because most of her work was funded by Dr. Crawford's research, and considered this retaliation. *Id.* at ¶¶ 410, 412.

On October 27, 2016, Dr. Crawford was ordered to have no contact with Ms. Goldstein. ECF 22 ¶ 421. The University's Title IX office received a demand letter from Ms. Goldstein's prior counsel on November 3, 2016, *id.* at ¶ 441, which outlined Dr. Crawford's harassment of Ms. Goldstein beginning in 2015 with contributing facts from as early as 2014, *id.* at ¶¶ 106–08.[5] Dr. Toursavadkohi, BREF's Dave Johnson, and the Title IX office's Tricia O'Neal forbade Ms. Goldstein from talking to third parties about the no-contact order. *Id.* at ¶¶ 425–27. This, in turn, made it difficult for Ms. Goldstein to communicate with sponsors of the study, an important part of her work, and also meant she was unable to communicate with individuals from whom she had expected to receive recommendation letters for graduate school. *Id.* at ¶¶ 430, 432. Ms. Goldstein claims that this constituted a tangible adverse employment action. *Id.* at ¶ 431.

Ms. Goldstein believes that Dr. Crawford was notified about her sexual harassment complaint to the Title IX office on November 15, 2016. *Id.* at ¶ 443. On January 11, 2017, Ms. Goldstein notified the Title IX office that she heard from a trainee that Dr. Crawford wanted to hire a private investigator to follow Ms. Goldstein. *Id.* at ¶ 454. Ms. Goldstein also notified the

---

[5] Ms. Goldstein claims that the no-contact order was issued in response to her demand letter, which is inconsistent with the timeline she presented. *Id.* at ¶ 422. The University also asserts that the no-contact order was issued promptly in response to receiving notice of Ms. Goldstein's complaint. Def.'s Mem. of Law in Supp. of Def.'s Mot. to Dismiss, ECF 30-1, at 6.

Title IX office that Dr. Crawford had contacted a product representative she had previously dated "to request that the representative falsely claim Goldstein would get drunk and go home with random men." *Id.* at ¶ 456. In April 2017, Ms. Goldstein resigned from her position. *Id.* at ¶ 475.

On February 3, 2017, Ms. Goldstein filed charges of discrimination with the EEOC against the University of Maryland School of Medicine. *Id.* at ¶ 468; ECF 30-3. The charge alleged sexual harassment beginning in 2016. ECF 22 ¶ 106. In addition to her charge, Ms. Goldstein provided the EEOC investigator with a copy of the November 3, 2016, demand letter. *Id.* at ¶ 469. Also, prior to signing the final charge, Ms. Goldstein informed the investigator in person that Dr. Crawford's harassment had begun prior to the period defined in the charging document. *Id.* at ¶ 470. On July 27, 2018, the EEOC issued a right to sue notice. *Id.* at ¶ 119.

The Title IX office investigated Ms. Goldstein's allegations, and on June 5, 2017, the University issued its findings, concluding that no violations of hospital policy had occurred. *Id.* at ¶ 467. On June 9, 2017, the University informed Ms. Goldstein that it concluded, by a preponderance of the evidence, that Dr. Crawford had not subjected Ms. Goldstein to unwelcome sexual harassment, instead concluding that Dr. Crawford and Ms. Goldstein had engaged in a personal relationship that extended beyond the workplace and involved Dr. Crawford exercising poor judgment for someone in his position. *Id.* at ¶¶ 478–79. To that end, the University had interpreted Ms. Goldstein's text messages with Dr. Crawford, which she claims were sent to placate him, as evidence of her willingness to engage in the relationship with him. *Id.* at ¶ 481.

In addition to her allegations that Dr. Crawford had sexually discriminated against her, Ms. Goldstein also alleges in her amended complaint that Dr. Lijo Panghat, a post-doctoral research fellow at the University, harassed her in October 2015. *Id.* at ¶¶ 232, 266. Ms. Goldstein reported her complaints to Ms. Braganza and Dr. Lal in December 2015, *id.* at ¶¶ 266–69, and to Dr.

Toursavadkohi at an unidentified time, *id.* at ¶ 272. On or around December 11, 2015, Ms. Goldstein reported Dr. Panghat's behavior to BREF and VA officials, *id.* at ¶ 274, and Dr. Panghat was removed from his fellowship shortly thereafter, *id.* at ¶ 277. Ms. Goldstein alleges that the University exhibited deliberate indifference to her claims against Dr. Panghat by failing to report her claims to the Title IX coordinator. *Id.* at ¶ 275. She also alleges that Ms. Braganza and Dr. Lal reprimanded her for reporting Dr. Panghat's behavior, and that Dr. Lal spread sexual rumors about Ms. Goldstein after the incident. *Id.* at ¶¶ 276, 526–27.

On November 30, 2018, Ms. Goldstein filed her amended complaint, naming as defendants the University of Maryland School of Medicine,[6] University of Maryland, Baltimore, and the Baltimore Research and Education Foundation, Inc.[7] The amended complaint alleged that the University had (1) permitted unlawful sexual discrimination and sexual harassment and imposed a hostile work environment; and (2) unlawfully retaliated against her and imposed a retaliatory hostile work environment, all in violation of Title IX, 20 U.S.C. §§ 1681–1688, Title VII, 42 U.S.C. § 2000e *et seq.*, and the Maryland Fair Employment Practices Act ("FEPA"), MD. CODE ANN., STATE GOV'T § 20-1001 *et seq.*.[8] Generally, Ms. Goldstein claims that the University was deliberately indifferent to her repeated complaints regarding the sexual harassment and discrimination she routinely experienced from Dr. Crawford, and that it permitted Dr. Crawford to retaliate against her for reporting such treatment, creating a hostile work environment.

---

[6] The University of Maryland School of Medicine is not a separate legal entity but is within the University of Maryland, Baltimore. Mem. of Law in Supp. of Def.'s Mot. to Dismiss, ECF 30-1, at 4 n.1. They will be collectively referred to as "the University."

[7] Goldstein dismissed her complaint against BREF with prejudice on March 22, 2019. ECF No. 43; ECF No. 44.

[8] Ms. Goldstein's original complaint included claims that the University had violated Title VI, which concerns discrimination on the basis of race, color, or national origin, and a claim of constructive discharge. Ms. Goldstein removed such claims in her amended complaint.

## STANDARD OF REVIEW

To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted). "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). Additionally, although courts "must view the facts alleged in the light most favorable to the plaintiff," they "will not accept 'legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments'" in deciding whether a case should survive a motion to dismiss. *U.S. ex rel. Nathan v. Takeda Pharm. North Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (quoting *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)).

## ANALYSIS

The University challenges Ms. Goldstein's complaint on several grounds. First and foremost, it claims that the court should dismiss Ms. Goldstein's complaint entirely because the University was not Ms. Goldstein's employer during the alleged period of discrimination, harassment, and retaliation. The University alleges Ms. Goldstein was employed by BREF, and, when she was supervised by Dr. Crawford and Dr. Lal, they were acting pursuant to their VA rather than their University appointments. Mem. of Law in Supp. of Def.'s Mot. to Dismiss, ECF 30-1 at 4, 14, 17. Regarding Ms. Goldstein's claims of a hostile work environment, the University

8

contends that the court lacks subject matter jurisdiction to rule on the claims due to Ms. Goldstein's failure to exhaust administrative remedies.[10] The University also claims it did not exhibit deliberate indifference to Ms. Goldstein's complaints. Regarding the retaliation claims, the University argues that over half of Ms. Goldstein's claims of retaliation are actually *quid pro quo* claims, and the remaining half (1) are time barred, and (2) fail to allege sufficiently all of the elements for a prima facie case of retaliation. The court will address these arguments in the order in which the University raised them.

a. **Joint Employer**

In 2015, the Fourth Circuit recognized that a single employee may have multiple employers in the Title VII context.[11] In *Butler v. Drive Auto. Industr. of Am., Inc.*, the Fourth Circuit expressly adopted the joint employer doctrine, explaining that when "one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer[,]" both the employer and the otherwise independent company are joint employers of such employees. 793 F.3d 404, 408–09 (4th Cir. 2015) (internal citation and quotation marks omitted). In such a situation, the Fourth Circuit held that a joint employer could be found liable under Title VII to prevent employers "who effectively employ a worker from evading liability by hiding behind another entity, such as a staffing agency." *Id.* at 410 (internal citation and quotation marks omitted). Thus, "[g]iven Title VII's remedial intent, employers should not be able to avoid Title VII by affixing a label to a person that does not capture the substance of the employment

---

[10] Subsequent to the parties' briefing in this case, the Supreme Court ruled in *Fort Bend County, Texas v. Davis*, 139 S.Ct. 1843, 1850, 1952 (2019) that Title VII's charge-filing requirements are not jurisdictional, but are nonetheless mandatory.

[11] The Fourth Circuit has noted that "[w]e look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX." *Jennings v. Univ. of N. C.*, 482 F.3d 686, 695 (4th Cir. 2007) (internal citations omitted).

relationship." *Id.* (internal citation and quotation marks omitted).

In adopting the hybrid test for joint employer (rather than the economic realities test or the control test employed by some other circuits, *id.* at 410-14), the Fourth Circuit set forth nine factors to be used in determining whether an entity qualifies as a joint employer. *Id.* at 414. The factors are as follows:

> (1) authority to hire and fire the individual;
> (2) day-to-day supervision of the individual, including employee discipline;
> (3) whether the putative employer furnishes the equipment used and the place of work;
> (4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes;
> (5) the length of time during which the individual has worked for the putative employer;
> (6) whether the putative employer provides the individual with formal or informal training;
> (7) whether the individual's duties are akin to a regular employee's duties;
> (8) whether the individual is assigned solely to the putative employer; and
> (9) whether the individual and putative employer intended to enter into an employment relationship.

*Id.* Although the *Butler* court noted that the first three factors were the most important, *id.*, and that the final factor was "of minimal consequence" and only "part of the overall fact-specific inquiry into the putative employee's circumstances[,]" *id.* at 414 n. 12, it emphasized that "no one factor is determinative, and the consideration of factors must relate to the particular relationship under consideration." *Id.* at 415 (internal citation and quotation marks omitted). "Courts should be mindful that control remains the principal guidepost for determining whether multiple entities can be a plaintiff's joint employers." *Id.* Here, the court will address only those *Butler* factors that affect the court's considerations based on the facts alleged in the amended complaint.

The first factor weighs in favor of finding that the University was one of Ms. Goldstein's employers. The University arranged for Ms. Goldstein's hiring through BREF, and Ms. Goldstein alleges that the University determined Ms. Goldstein's pay rate. ECF 22 ¶¶ 30–31, 35–36.

10

Additionally, Dr. Sarkar, who did not hold a VA appointment, at one point informed Ms. Goldstein that her full-time status was at risk of being reduced to part-time, *id.* at ¶ 409, indicating that the University exercised authority over Ms. Goldstein as an employee.

The second factor also works in favor of Ms. Goldstein's claim that the University was her employer. According to Ms. Goldstein, she was assigned work by Drs. Crawford and Lal, "under the authority of Dr. Sarkar, their Chief, who held only a University appointment and none with BREF or VA, and who also delegated assignments to Goldstein such as hiring another research assistant for the university." *Id.* at ¶ 66. While the University claims that any supervision by Drs. Crawford and Lal of Ms. Goldstein were solely pursuant to their VA appointments, Ms. Goldstein's allegations cast doubt on this. She claims that she discussed Dr. Crawford's harassment with Dr. Sarkar, who supervised Dr. Crawford and has no VA appointment, and that it was Dr. Sarkar who informed her she might be reduced to part-time status. *Id.* at ¶ 65. This indicates that the University was involved in Ms. Goldstein's day-to-day supervision and, at the very least, makes this a question of fact inappropriate for resolution on a motion to dismiss.

The third factor, however, cuts in favor of the University not being Ms. Goldstein's employer. Ms. Goldstein worked primarily at the VA using VA resources, and spent minimal time working at the University.

The seventh factor works in favor of finding that the University was Ms. Goldstein's employer. Dr. Sarkar instructed Ms. Goldstein to recruit another researcher, whose duties mirrored Ms. Goldstein's and whom Ms. Goldstein trained despite the fact that the new researcher was funded through the University, not BREF.

The eighth factor weights slightly in favor of finding that the University was Ms. Goldstein's employer. Ms. Goldstein's work was supposed to focus on University projects, due

11

to her funding through BREF's University account, but in reality also involved some work on VA assignments. Dr. Sarkar acknowledged Ms. Goldstein's sole intended assignment to University projects when he noted that the University should refund BREF for some portion of Ms. Goldstein's salary as it related to her time spent on VA projects. *Id.* at ¶ 76–78. Nevertheless, the majority of Ms. Goldstein's work was done on projects funded by University grants. *Id.* at ¶ 76.

Thus, the court concludes, based upon the facts set forth in the amended complaint, that Ms. Goldstein has alleged with sufficient particularity that the University was at least a joint employer during the period relevant to her complaint.

### b. Administrative Exhaustion of Hostile Work Environment Claims

Both Title VII and FEPA require plaintiffs alleging hostile work environments to exhaust their administrative remedies prior to initiating suit. 42 U.S.C. § 2000e-5(f)(1); MD. CODE ANN., STATE GOV'T § 20-1004(c)(1), § 20-1013(a); *see also Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297, 306 (4th Cir. 2019). Specifically, "Title VII gives initial enforcement responsibility to the EEOC[,]" such that "[a]n individual alleging discrimination in violation of Title VII must first file an administrative charge with the EEOC[.]" *Chacko v. Patuxent Inst.*, 429 F.3d 505, 508 (4th Cir. 2005). Requiring plaintiffs to first file a charge with the EEOC serves two principal purposes: "First, it notifies the charged party of the asserted violation. Secondly, it brings the charged party before the EEOC and permits effectuation of the [Civil Rights] Act's primary goal, the securing of voluntary compliance with the law." *Balas v. Huntington Ingalls Industr., Inc.*, 711 F.3d 401, 406–07 (4th Cir. 2013) (internal citation and quotation marks omitted) (insertion in original).

In furtherance of these aims, the Fourth Circuit has "held that the scope of the plaintiff's right to file a federal lawsuit is determined by the [EEOC's] charge's contents" to prevent plaintiffs

12

from "rais[ing] claims in litigation that did not appear in [their] EEOC charge[s]." *Sydnor v. Fairfax Cty., Va.*, 681 F.3d 591, 593 (4th Cir. 2012) (internal citation and quotation marks omitted). A plaintiff "fails to exhaust his administrative remedies where . . . his administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in his formal suit." *Id.* (citing *Chacko*, 429 F.3d at 506) (internal quotation marks omitted) (alteration in original).

Such a requirement, however, does not require claims in the judicial complaint to mirror completely those in the EEOC charge. Instead, the Fourth Circuit has "long held that courts may in fact adjudicate claims not raised before the [EEOC] agency, if certain requirements are met." *Stewart v. Iancu*, 912 F.3d 693, 705 (4th Cir. 2019). Within this understanding is the "generally accepted principle that the scope of a Title VII lawsuit may extend to any kind of discrimination like or related to allegations contained in the charge and growing out of such allegations during the pendency of the case[.]" *Id.* (internal citation and quotation marks omitted). "Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit." *Id.* (citing *Chacko*, 429 F.3d at 506) (internal quotation marks omitted).

The University alleges that Ms. Goldstein did not administratively exhaust several claims, because they were not included in her EEOC charge, including the alleged harassment and retaliation by Dr. Sarkar, sexual harassment by Dr. Panghat, and pre-2016 harassment by Dr. Crawford. ECF 30-1, at 22; Reply in Further Supp. of Def.'s Mot. to Dismiss, ECF 47, at 12. Ms. Goldstein argues that she raised these claims in a demand letter given to the University and the EEOC investigator, and, regardless, the additional claims are "like or related" to those in her EEOC

13

charge. Pl's Opp'n to Def.'s Mot. to Dismiss, ECF 39 at 15, 18.

First, "[i]n determining what claims a plaintiff properly alleged before the EEOC, we may look only to the charge filed with the agency." *Balas*, 711 F.3d at 407. *Balas* asked whether claims raised only in the EEO intake questionnaire and private letters sent to the EEOC were administratively exhausted. *Id.* at 406. Here, unlike in *Balas*, the demand letter was sent to University defendants. Ms. Goldstein, however, has provided no precedent for her argument that the court should consider claims presented in a separate demand letter to be part of the EEOC charge for the purposes of administrative exhaustion, and Fourth Circuit precedent clearly points the other way. Nor is this case like *Agolli v. Office Depot, Inc.*, where the Fourth Circuit considered 23 pages of continuation sheets to be attached to and part of the EEOC charge, when the EEOC charge stated "see attached for general explanation, and ongoing info also." 548 F. App'x 871, 873, 875 (4th Cir. 2013). [12] In contrast, nothing in Ms. Goldstein's EEOC charge indicates that the demand letter was supposed to be attached to the charge. *See Sawyers v. UPS*, 946 F. Supp. 2d 433, 439–40 (D. Md. 2013) ("[A]ny document that is not part and parcel of the administrative charge cannot be considered by this Court.").

Next the court considers whether the allegations are "like or related" to the allegations in the EEOC charge, so that they may still be considered administratively exhausted. *See Stewart*, 912 F.3d at 705. In the EEOC charge, Ms. Goldstein alleged that, "[b]eginning in April, 2016, Dr. Robert Crawford, supervisor, subjected me to unwelcome physical sexual advances and comments" and gives certain examples. Ms. Goldstein goes on to state that that she notified senior supervisor Dr. Toursavadkohi, who did nothing, and that Dr. Crawford and Dr. Lal began retaliating against her. ECF 30-3.

---

[12] Unreported cases are cited for the soundness of their reasoning, not for any precedential value.

In her amended complaint, Ms. Goldstein includes additional allegations, namely that Dr. Crawford's harassment started in April 2014, that beginning in 2013 Dr. Sarkar made improper comments, and that Dr. Sarkar retaliated against her by threatening to reduce her job to part-time. Ms. Goldstein also includes allegations in her amended complaint that she was sexually harassed by Dr. Panghat, which she reported to Ms. Braganza, Dr. Lal, and management at BREF and Veterans Administration, and for which she was retaliated against by Ms. Braganza and Dr. Lal.

The court will deny the motion to dismiss without prejudice as to the pre-2016 allegations against Dr. Crawford. While the pre-2016 allegations appear to be unexhausted, they may prove to be reasonably related to the allegations in the EEOC charge and, in any event, provide context. *See Alford v. Wang, Inc.*, 11 F. Supp. 3d 584, 589 (D.S.C. 2014) ("Although they are not *actionable*, they are not *necessarily* inadmissible, immaterial, or impertinent.").

The allegations against Dr. Sarkar[13] and Dr. Panghat, however, are not administratively exhausted as they were not included in the EEOC charge and are not "like or related" to the allegations in the charge. *See High v. R&R Transportation Inc.*, 242 F. Supp. 3d 433, 442 (M.D.N.C. 2017) ("[A]llegations of alleged harassing conduct by additional persons, not previously identified in the EEOC charges" are not within "the purview of claims articulated in Plaintiff's EEOC charges" and have not been administratively exhausted.). Additionally, claims

---

[13] Ms. Goldstein also alleges in her complaint (but did not include in the EEOC charge) that she complained to Dr. Sarkar about the harassment by Dr. Crawford and that Dr. Sarkar personally witnessed and knew about the harassment. Unlike the allegations of harassment *by* Dr. Sarkar, Ms. Goldstein's claims that she complained *to* Dr. Sarkar are reasonably related to the allegations in her EEOC charge. A reasonable investigation into Ms. Goldstein's claims necessarily should have involved Dr. Sarkar, as he served as the head of the University's vascular surgery department and supervisor of Dr. Crawford. Additionally, Ms. Goldstein's claim that she told Dr. Sarkar about the harassment are "[a]t most . . . additional theories to attribute liability . . . for the same hostile work environment" alleged in her EEOC charge. *Clanton v. City of Virginia Beach*, 2015 WL 1538198, at *7 (E.D. Va. 2015). Therefore, to the extent the claims related to informing Dr. Sarkar of the harassment and retaliation are challenged by the University, they have been administratively exhausted.

of retaliation by Ms. Braganza and Dr. Lal arising from Dr. Panghat's alleged harassment are also unexhausted. Ms. Braganza was not mentioned in the EEOC charge. While Ms. Goldstein did accuse Dr. Lal of retaliation in her EEOC charge, this was in regard to retaliation for complaints about Dr. Crawford. The allegations against Dr. Lal in the amended complaint, however, relate to Dr. Lal's alleged spreading of sexual rumors about Ms. Goldstein and Dr. Panghat. This alleged conduct relates to Dr. Panghat's harassment, which was not mentioned in the charge, and occurred several months before the time frame stated in the charge. The allegations of retaliation against Dr. Lal and Ms. Braganza are not like or related to the claims in the EEOC charge. Therefore, these claims have not been administratively exhausted and will be dismissed.

### c. Deliberate Indifference to Hostile Work Environment

Unlike Title VII, Title IX does not require that plaintiffs first exhaust administrative remedies. Nonetheless, the University argues that the court should dismiss Ms. Goldstein's Title IX hostile work environment claim for failure to plead sufficient facts to satisfy Title IX's deliberate indifference standard.

Congress enacted Title IX in an effort to prevent discriminatory practices on the basis of sex from being effectuated by recipients of federal education funding and to provide individuals with protections against such practices. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 247, 286 (1998) (internal citation and quotation marks omitted). In *Gebser*, the Supreme Court ruled that the deliberate indifference standard should apply to Title IX claims for damages, *id.* at 290–91, explicitly refusing to apply the more lenient *respondeat superior* or constructive notice doctrines in such cases, *id.* at 285.

Importantly, the *Gebser* court found that unless "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the

recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond[,]" the recipient entity cannot be held liable for damages resulting from Title IX violations. *Id.* at 290. In so doing, the Supreme Court ensured that educational institutions receiving federal funding are held responsible solely for their "own official decision[s]" rather than "for [their] employees' independent actions." *Id.* at 290–91.

The University does not dispute, for the purposes of its motion, that Ms. Goldstein was subjected to discrimination and harassment due to her sex. Rather, it asserts that the amended complaint does not establish that an authorized University official with (1) actual knowledge of the discrimination and harassment, (2) the authority to address such discrimination, and (3) the authority to institute corrective measures, knew of Ms. Goldstein's plight until she submitted her demand letter. Once she submitted her demand letter, the University asserts that its Title IX office responded to her complaints appropriately.

In coming to this conclusion, the University notes that its Title IX policy designates all University administrators and faculty as "responsible employees" who, upon receiving "a complaint of Prohibited Sex Discrimination shall promptly report the complaint to the Title IX Coordinator." ECF 30-5 at 27. Further, the policy specifies that "[n]o employee is authorized to *investigate* or *resolve* complaints of Prohibited Sex Discrimination without the involvement of the Title IX Coordinator." *Id.* at 32 (emphasis added). Thus, the University argues that only its Title IX office qualifies as the kind of official subject to *Gebser*'s deliberate indifference standard.

At the motion to dismiss stage, however, it appears that one or more of the individuals to whom Ms. Goldstein complained may have had the requisite authority to address the alleged discrimination and institute at least some corrective measures. Ms. Goldstein alleges that she complained about Dr. Crawford's behavior and comments to "responsible officials" including Drs.

Sarkar and Toursavadkohi. ECF 22 ¶ 73. On at least one instance, she reported her complaints to Dr. Toursavadkohi, who told her he would handle the situation. Following this, Dr. Crawford was instructed to apologize to Ms. Goldstein, ostensibly by an official with the authority to do so. *See, e.g., Doe v. Bd. Of Educ. of Prince George's Cty.*, 888 F. Supp. 3d 659, 667 (D. Md. 2012) ("Construed favorably, Plaintiffs' allegations that Schwab promised to take measures to remediate the harassment support the [] inference" that Schwab possessed authority to address the alleged harassment).

Authority is a fact-specific question. In *Baynard v. Malone,* the Fourth Circuit found that the school board had reserved for itself the traditional powers of an employer, i.e. the authority to hire, fire, or suspend employees, such that a principal who lacked such authority could not be found to have had the power to take corrective action under *Gebser*. 268 F.3d 228, 238–39 (4th Cir. 2001). Thus, the school board, although not a Title IX office, qualified as a satisfactory authority pursuant to the *Gebser* test and the principal did not. *Id.* at 239; *see also Doe*, 888 F. Supp. 2d at 667 ("[T]he *Baynard* court grounded its decision on the narrow, fact-specific determination that the principal lacked authority under Virginia state law to fire the offending teacher." (internal citation omitted)). In 2007, however, the Fourth Circuit found that the plaintiff's reporting of prolonged sexual harassment to an individual who was assistant to the university's chancellor, counsel to the university, and "an official responsible for fielding sexual harassment complaints" was sufficient to establish that the plaintiff had provided the university with "actual notice of the hostile environment created." *Jennings v. Univ. of N.C.*, 482 F.3d 686, 700–01 (4th Cir. 2007). These cases demonstrate that the question of who has the power to take corrective action is fact-specific and would be inappropriate for resolution here. *See Doe*, 888 F. Supp. 2d at 667 ("Here, discovery has yet to commence . . . and the Court considers merely whether

Plaintiffs have stated a cognizable Title IX sexual harassment claim. Hence, *Baynard* is inapposite . . . ).

Ms. Goldstein has also sufficiently pled that the alleged responsible officials "fail[ed] to adequately respond or display[ed] deliberate indifference." *Jennings*, 482 F.3d at 700 (internal quotations and citations omitted). At this stage, Ms. Goldstein has alleged that Drs. Sarkar and Toursadvakohi "fail[ed] to take any action to remedy the situation" except once ordering Dr. Crawford to apologize to Ms. Goldstein. *See Jennings*, 482 F.3d at 701. While the failure to follow sexual harassment grievance procedures "is not determinative" in showing deliberate indifference, *Doe v. Bd. Of Educ. of Prince George's Cty.*, 605 Fed App'x 159, 168 (4th Cir. 2015), the corrective measures taken by the defendants should be considered as a whole. *See id.* Here, Ms. Goldstein alleges that Dr. Sarkar and Dr. Toursavadkohi not only did not report her complaints to higher-ups but also did not attempt to institute any other substantial corrective measures.

Ms. Goldstein, however, has not sufficiently pled deliberate indifference in regard to the Title IX office. Although Ms. Goldstein contests the outcome of the University's Title IX office's investigation into her claims, there is no basis for the court to conclude that the office acted with deliberate indifference. To the contrary, Ms. Goldstein's amended complaint establishes that, upon receipt of her claims, the Title IX office immediately instituted a no-contact order between Ms. Goldstein and Dr. Crawford and began a thorough investigation into her allegations. It concluded its investigation by issuing its findings, with which Ms. Goldstein disagrees. This disagreement, however, cannot serve as the basis for finding deliberate indifference, as nothing in the case law suggests that complainants are entitled to an outcome with which they agree. As such, the court will dismiss the portion of Ms. Goldstein's complaint alleging that the University's Title IX office acted with deliberate indifference towards her hostile work environment claims.

19

**d. Retaliation under Title VII and FEPA**

Next, the University contends that the court should dismiss Ms. Goldstein's retaliation claims pursuant to Title VII and FEPA because 1) approximately half are time-barred, and 2) the other half do not meet all of the *prima facie* elements for retaliation. The court agrees that some of Ms. Goldstein's retaliation claims are time-barred and not subject to the continuing violation theory, and thus will dismiss these.

Ms. Goldstein alleges both retaliation consisting of discrete materially adverse actions as well as retaliatory hostile work environment. *See Fordyce v. Prince George's Cty. Md.*, 43 F. Supp. 3d 537, 548–52 (D. Md. 2014) (retaliation can be established by showing a materially adverse employment action or that the actions taken together are "sufficiently severe or pervasive" to create a hostile work environment) (quoting *Baqir v. Principi*, 434 F.3d 733, 745–46 (4th Cir. 2006)).

Title VII renders it unlawful for an employer to retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice" under Title VII, or because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" pursuant to Title VII protections. 42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of Title VII retaliation, a plaintiff must prove that (1) she engaged in a protected activity; (2) her employer took an adverse employment action against her; and (3) there was a causal link between the two. *Boyer-Liberto v. Fountainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (internal citation and quotation marks omitted). To establish a retaliatory hostile work environment, "a plaintiff must show that (1) he experienced unwelcome harassment; (2) the harassment was [in retaliation for protected conduct]; (3) the harassment was sufficiently severe or pervasive to alter the conditions of his employment to create an abusive atmosphere; and

(4) there is some basis for imposing liability on the employer." *Wells v. Gates*, 336 F. App'x 378, 387 (4th Cir. 2009) (quoting *Baqir*, 434 F.3d at 745–46) (internal quotation marks omitted) (alteration in original). The court should consider the conduct's "frequency," "severity," "whether it [was] physically threatening or humiliating," and "whether it unreasonably interfere[d] with an employee's work performance." *Id.* at 388 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

Regarding the first prong of a *prima facie* retaliation claim, the Fourth Circuit has adopted an "expansive view of what constitutes oppositional conduct, recognizing that it encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015) (internal citations and quotation marks omitted). The adverse employment action element should be read broadly to "extend[] beyond workplace-related or employment-related retaliatory acts and harm[,]" and includes adverse acts that would have "dissuaded a reasonable employee from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006) (internal citations omitted). Retaliatory harassment "may constitute a materially adverse action" in violation of Title VII. *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 694 (4th Cir. 2018) (internal citation omitted).

To protest such treatment, an employee who believes she was subject to illegal retaliation must file a charge with the EEOC within 300 days of the alleged discriminatory act. 42 U.S.C. § 2000e-5(e)(1); *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002).[18] Under

---

[18] For states that do not have "a State or local agency with authority to grant or seek relief from such practice," aggrieved employees only have 180 days from the date of the alleged unlawful employment practice to file their charge. 42 U.S.C. § 2000e-5(e)(1).

FEPA, plaintiffs have two years from the alleged unlawful employment action to initiate civil suit. MD. CODE ANN., STATE GOV'T § 20-1013(a)(3).[19] In *Morgan*, the Supreme Court held that Title VII retaliation claims which occurred outside of the statutory window may not be included with claims filed within the statutory window under the continuing violations doctrine. *Morgan*, 536 U.S. at 105, 113. Specifically, the Supreme Court found that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges[,]" and included retaliation claims under the umbrella of discrete discriminatory acts. *Id.* at 113. In contrast, in a hostile work environment claim, the charge "will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Id.* at 121.

As discussed above, some of Ms. Goldstein's retaliation claims have not been administratively exhausted. Several retaliation claims that are exhausted, however, are nevertheless time barred and must be dismissed. Title VII retaliation claims must be filed within 300 days of the alleged discriminatory act, and FEPA sets forth a two-year statute of limitations for such claims. As a result, all of Ms. Goldstein's Title VII retaliation claims prior to April 9, 2016 (300 days prior to her submission of her EEOC charge on February 3, 2017) and her FEPA retaliation claims prior to August 2, 2016 (two years prior to her initiating suit on August 2, 2018) will be dismissed as time-barred.[20] Since the statute of limitations for hostile work environment claims treats the entire period as one adverse event, Ms. Goldstein's retaliatory hostile work environment claim is not time barred because she has sufficiently alleged that at least one

___

[19] During the 2019 legislative period, the Maryland General Assembly enacted an amendment to this provision, extending the statute of limitations to three years for claims alleging harassment. 2019 Md. Laws Ch. 222. This amendment takes effect on October 1, 2019. *Id.*

[20] Even if Ms. Goldstein's allegations relating to the University's retaliation against her for reporting Dr. Panghat's harassing behavior were exhausted, they would also be time-barred and dismissed for this reason.

retaliatory act that is part of her hostile work environment claim took place within the statutory time period.[21]

As for Ms. Goldstein's remaining retaliation claims, the court concludes that Ms. Goldstein's amended complaint sets forth sufficient allegations to conclude that the University and its employees, namely Dr. Crawford, retaliated against her for opposing his discriminatory behavior. While the amended complaint does not provide a wealth of information, Ms. Goldstein does allege that she opposed Dr. Crawford's behavior on numerous occasions, such as by telling him to stop his unwelcome advances and complaining to Dr. Sarkar. Ms. Goldstein has sufficiently alleged protected activity at this stage. *DeMasters*, 796 F.3d at 417 ("[w]hen an employee communicates to her employers a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity.") (quoting *Crawford v. Metro. Gov't of Nashville and Davidson Cty., Tenn.*, 555 U.S. 271, 276 (2009)).

Ms. Goldstein has also sufficiently alleged at this stage that she was subjected to adverse acts that would dissuade a reasonable employee from engaging in protected activity. For example, of the remaining exhausted and timely retaliation claims, Ms. Goldstein alleges that Dr. Crawford retaliated against her by ignoring her work product and refusing to sign necessary papers, trying to access and spy on her after the no-contact order, contacting a product representative she had dated, and berating her in an August 15, 2016, meeting with her supervisors. *See Burlington*, 548 U.S. at 69 ("Context matters. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships[,]" and courts should consider this constellation in determining "the significance of any given act of retaliation" (internal

---

[21] As discussed above, Ms. Goldstein's retaliatory hostile work environment claim may still be limited by the administrative exhaustion requirements.

citation and quotation marks omitted)).

Finally, Ms. Goldstein alleges that Dr. Crawford created a retaliatory hostile work environment. Whether Dr. Crawford's conduct was severe or pervasive enough to constitute a hostile work environment cannot be determined at this stage. Additionally, whether Dr. Crawford's conduct is imputable to the University will depend on Dr. Crawford's supervisory role with respect to Ms. Goldstein, which the court does not have enough information to decide.

As such, the court will dismiss Ms. Goldstein's Title VII and FEPA retaliation claims for conduct occurring before April 9 and August 2, 2016, respectively.[22]

### e. Title IX Retaliation

The University contends that the court should dismiss Ms. Goldstein's Title IX retaliation claim due to Ms. Goldstein's failure to plead facts sufficient to establish the University's awareness of her allegations and her failure to allege the University's deliberate indifference to such allegations. In 2005, the Supreme Court held that Title IX's prohibition on sex discrimination includes claims of retaliation. *Jackson v. Birmingham Bd. of Edu.*, 544 U.S. 167, 173-74 (2005) ("Retaliation is, by definition, an intentional act. It is a form of 'discrimination' because the claimant is being subjected to differential treatment."). Therefore, when an institution subject to Title IX "retaliates against a person *because* he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." *Id.* at 174 (emphasis and quotation marks in original).

The *Jackson* court, however, did not "spell[] out the specific elements of such a retaliation claim[,]" nor has the Supreme Court done so in the years since. *Feminist Majority*, 911 F.3d at 694. Therefore, the Fourth Circuit instead has elected to apply the "familiar Title VII retaliation

---

[22] For the reasons discussed above, however, this conduct occurring prior to August 2016 is not time-barred for the purposes of Ms. Goldstein's retaliatory hostile work environment claim.

concepts to the requirements of a Title IX retaliation claim." *Id.* As a result,

> [a]t the pleading stage, the plaintiffs are required to sufficiently allege two elements to state a Title IX retaliation claim. First, they must allege that they engaged in protected activity under Title IX, and second, they must allege that – as a result of their protected activity – they suffered an adverse action attributable to the defendant educational institution.

*Id.* (internal citations omitted).

Adverse actions can be attributable to the educational institution if the institution acted "with deliberate indifference" to known instances of retaliatory harassment. *See id.* at 695 (in the context of the failure to stop student-on-student retaliatory harassment).

As discussed above, Ms. Goldstein has adequately alleged that she engaged in protected activity in opposing Dr. Crawford's harassment. Ms. Goldstein has also sufficiently alleged that she suffered an adverse action attributable to the defendant educational institution through the deliberate indifference of individuals such as Dr. Sarkar and Dr. Toursavadkohi. *See supra page 19.* Accordingly, in consideration of the court's conclusion in the preceding section of this opinion and the Fourth Circuit's *Feminist Majority* ruling, the court will not dismiss Ms. Goldstein's Title IX retaliation claim for failure to establish the University's actual knowledge and deliberate indifference.

### f. Construal of Motion as Motion to Dismiss

Finally, the court will construe the University's motion as a motion to dismiss and will not consider its arguments in favor of summary judgment at this time. "As a general proposition, summary judgment is appropriate only after adequate time for discovery." *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council*, 721 F.3d 264, 280 (4th Cir. 2013) (internal citation and quotation marks omitted). "Discovery is usually essential in a contested proceeding prior to summary judgment." *Id.* The Fourth Circuit has cautioned district courts against granting summary judgment in cases "where the nonmoving party has not had the opportunity to discover

information that is essential to [its] opposition." *Id.* (internal citation and quotation marks omitted) (alteration in original). As such, given that the parties have not yet had the opportunity to engage in discovery, and in consideration of Ms. Goldstein's affidavit requesting discovery pursuant to Fed. R. Civ. P. 56(d), (ECF 41), the court will not consider the University's arguments in favor of summary judgment. Further, based upon its construal of the motion as a motion to dismiss, the court will not consider the University's arguments based on the *Faragher-Ellerth* doctrine, originating in the Supreme Court's decisions in *Faragher v. City of Boca Rotan*, 524 U.S. 775 (1998) and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), as the court ordinarily will not consider affirmative defenses at the pleading stage. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) ("a motion to dismiss filed under Federal Rule of Procedure 12(b)(6), which tests the sufficiency of the complaint, generally cannot reach the merits of an affirmative defense").[23] The parties may, if they so choose, file motions for summary judgment upon the completion of discovery.

## CONCLUSION

For the foregoing reasons, the court will grant in part and deny in part the University's motion to dismiss or, alternatively, for summary judgment, treated as a motion to dismiss. A separate order follows.

9-17-19
_____
Date

_____
Catherine C. Blake
United States District Judge

---

[23] Typically, arguments that claims should be dismissed for being time-barred are considered affirmative defenses inappropriate for consideration at the motion to dismiss stage. *Goodman*, 494 F.3d at 464. Such a defense may be reached at the motion to dismiss stage "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint." *Id.* That is the case for the University's time-bar arguments regarding Ms. Goldstein's retaliation claims, hence the court's decision, detailed *supra*, to dismiss the portion of the retaliation claims which are time-barred.